# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

*People v. Wrice*, 2012 IL 111860

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. STANLEY WRICE, Appellee. |
| | |
| Docket No. | 111860 |
| Filed | February 2, 2012 |
| | |
| Held | The use of a defendant's physically coerced confession as substantive evidence of his guilt is never harmless error and can establish the "prejudice" prerequisite for leave to file a successive postconviction petition. |
| (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | |
| | |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Evelyn B. Clay, Judge, presiding. |
| | |
| Judgment | Affirmed as modified; cause remanded with directions. |

Counsel on Appeal

Lisa Madigan, Attorney General, of Springfield, and Stuart A. Nudelman, Special State's Attorney, of Chicago (Myles P. O'Rourke, Andrew N. Levine, Rafael A. Bombino and Brian J. Stefanich, Assistant Special State's Attorneys, of counsel), for the People.

Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy Defender, and Heidi Linn Lambros, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee.

Robert M. Stephenson and Steven W. Becker, of Becker Stephenson LLC, of Chicago, for *amicus curiae* the Chicago Innocence Project.

G. Flint Taylor, Jr., and Joey L. Moguel, of the People's Law Office, and Locke E. Bowman and Alexa A. Van Brunt, all of Chicago, for *amicus curiae* Persons Concerned about the Integrity of the Illinois Criminal Justice System.

Justices

JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Garman, Karmeier, and Burke concurred in the judgment and opinion.

Justice Thomas took no part in the decision.

## OPINION

¶ 1 In October 2007, defendant Stanley Wrice filed a petition in the circuit court of Cook County seeking leave to file a second successive postconviction petition challenging his 1983 convictions for rape and deviate sexual assault. Defendant alleged that newly discovered evidence substantiated his prior claim that his confession was the product of police brutality and torture. The trial court denied defendant leave to file his successive postconviction petition. The appellate court reversed and remanded for a third-stage evidentiary hearing, holding that defendant had satisfied the cause-and-prejudice test for successive postconviction petitions. 406 Ill. App. 3d 43.

¶ 2 For the reasons that follow, we affirm the appellate court's judgment reversing the trial court's order denying leave to file, but remand the cause to the trial court for appointment of postconviction counsel and second-stage postconviction proceedings.

¶ 3 BACKGROUND

¶ 4 In the early morning hours of September 9, 1982, 33-year-old K.B. was sexually

assaulted, beaten, and burned. Several men, including defendant, were implicated in the attack, which occurred in the attic of defendant's Chicago residence. Defendant, then 28 years old, was charged with numerous offenses, including rape and deviate sexual assault. Prior to trial, defendant moved to suppress inculpatory statements he allegedly made to investigators arguing, *inter alia*, that the statements were made "as a result of psychological, physical and mental coercion" by Detective Peter Dignan and Sergeant John Byrne.[1]

¶ 5    At the suppression hearing, Dignan, Byrne, and Dioguardi testified regarding events following defendant's arrest on the morning of September 9, 1982. According to their testimony, defendant was taken to Area 2 Violent Crimes Headquarters, arriving there between 7 a.m. and 7:15 a.m. Byrne testified that as defendant was being led to a second-floor interview room, defendant stated, "I'll tell you everything." Dignan told defendant that he would be questioned later. Defendant was handcuffed to a ring on the wall in the interview room. At approximately 8 a.m., after Dignan advised defendant of his *Miranda* rights, Dignan, Dioguardi and Byrne spoke to defendant for 20 to 30 minutes, during which time defendant gave a statement. The officers denied striking defendant, threatening him, or abusing him in any manner.

¶ 6    At 10 a.m., Dignan called the Felony Review Unit of the Cook County State's Attorney's office and requested an assistant State's Attorney. Assistant State's Attorney Kenneth McCurry arrived at Area 2 at 10:30 a.m. and spoke with the three officers. At approximately 12:50 p.m., McCurry, accompanied by Dioguardi and Dignan, had a conversation with defendant. Before speaking with defendant, McCurry advised defendant of his *Miranda* rights. Defendant denied involvement in the crimes, indicating that he never went upstairs where the assault of K.B. took place. At approximately 1:35 p.m., at defendant's request, McCurry, Dioguardi and Dignan again spoke to defendant, who said he wanted to tell the truth. According to McCurry, defendant stated that he did go upstairs when K.B. was at the house. There, he saw a number of men having sexual intercourse with her. Defendant also stated that he saw Rodney Benson burn K.B. with an iron, and that he took the iron from Benson and dropped it on K.B.'s thigh. McCurry did not observe any injuries to defendant's face and did not notice anything unusual about defendant's walk. Defendant did not complain that he had been struck by police.

¶ 7    Defendant testified at the suppression hearing that, after his arrest, he was taken to Area 2 Headquarters and placed in a second-floor room, where he was handcuffed to a ring on the wall. Sergeant Byrne and Detective Dignan questioned him about what had happened at his house earlier that day. Defendant gave a statement but did not implicate himself. According to defendant, Dignan freed him from the wall ring and told him that he (Dignan) "was fixing to do some police brutality." Defendant testified that he was then taken to a room on a lower floor "that had bars in it, and what appeared to be cells." Upon questioning by Byrne, defendant repeated what he had told Byrne and Dignan upstairs. Byrne told defendant he was

---

[1]Although defendant's suppression motion also identified Detective David Dioguardi, defendant's testimony did not directly implicate Dioguardi in the alleged beatings and defendant has focused his claim of police brutality solely on Byrne and Dignan.

lying and hit him in the forehead with a flashlight that was 15 to 16 inches long. Dignan then struck defendant across his right thigh with a piece of rubber, approximately 12 to 13 inches long, which was taped on both ends. Byrne and Dignan continued to question defendant, striking him at random on his arms and thighs. Defendant testified: "Sergeant Byrne told me that we were about to return back upstairs; if he found out I was lying, I could expect the same thing."

¶ 8        Defendant further testified that sometime after returning upstairs, Dignan and Byrne accused defendant of lying, stating that Benson (who was also being questioned at Area 2) told them that defendant had burned K.B. Defendant testified that Byrne and Dignan took him back downstairs, where Dignan struck him with a piece of rubber across his left thigh and his left arm, and Byrne repeatedly struck him with a flashlight on his right arm and once in his chest. According to defendant:

> "As I tried to move my arm from Sergeant Byrne, Sergeant Byrne told me this time to stand up. I stood up. He grabbed my hands and turned me around and put my hands up over my head like this and my back was facing them, and my hands were up to the bars, and at this time Sergeant Byrne started kicking my legs apart and he told me he was going to let me see how it feels to be mistreated.
>
> At this time he hit me between my legs in my groin with the flashlight. He hit me once, then hit me again, and this time I was, you know, fell, like I was trying to fold up to keep him from hitting me again.
>
> At this time both of them grabbed me, unfolded me, stood me back up, and at this time Detective Dignan was hitting me between the legs in the groin with a piece of rubber.
>
> * * *
>
> Detective Dignan asked me would I, you know, when I go back upstairs, would I relate this to somebody–to an attorney that was investigating the case; and I told him I would relate to the attorney exactly what I had related to them earlier."

Defendant testified that after he was taken back upstairs, he had a 20-minute conversation with McCurry, at which Dioguardi and Dignan were present. Defendant stated that McCurry did not advise him of his constitutional right to an attorney or to remain silent, and that he only spoke to McCurry because he was afraid of Dignan and Byrne. Defendant gave McCurry the same statement he had given to police when he was first brought to Area 2. McCurry, Dioguardi and Dignan returned later, but defendant told McCurry that he had nothing else to say.

¶ 9        Chicago Police Lieutenant John Crane testified that Area 2 headquarters was formerly the Burnside police district and that the building contained two abandoned jail cells adjacent to the garage on the first floor. Although the cell doors had been removed, the rest of the bars comprising the lockup remained. The lockup area, which was used for storage, could be accessed by going down the stairs from the second floor, then proceeding first through a wooden door, which was unlocked, and then a steel door, which was locked. Lieutenant Crane testified that the key to the metal door was kept behind the front desk on the first floor,

-4-

which itself was behind a locked door.[2]

¶ 10    Defendant also presented medical testimony at his suppression hearing. Karem Ali Abdal-Aziz testified that he was a paramedic responsible for giving new inmates at the Cook County jail complete physical examinations and that he examined defendant on September 10, 1982. According to Abdal-Aziz's written report, defendant advised him of several injuries that occurred the day before. Defendant reported an injury to the left side of his head, his groin, right and left biceps, left shoulder, right hand, and his sternum, all from blunt trauma. Defendant also reported an injury to his thighs or kneecaps. Although Abdal-Aziz had no specific recollection of defendant's examination, he testified that inmates are required to remove their shirts for the examination and that he would have observed the injuries on the upper part of defendant's body. He would not have observed the leg and groin injuries that defendant reported.

¶ 11    Dr. Stanley Harper, a physician with Cermak Health Services, testified that he examined defendant on September 15, 1982. According to the doctor's examination notes, defendant reported that he had been beaten across his back, hands and legs with a flashlight and billy club by Chicago police one week earlier. He complained of pain in the groin, blood in his urine 24 to 48 hours after the beating, and burning or pain on urination. The notes from Dr. Harper's physical examination state that genitals were normal, but defendant complained of scrotal pain on palpation. Dr. Harper also noted multiple healing hematomas on defendant's left anterior leg. Although a urinalysis showed no evidence of blood, Dr. Harper testified that the urinalysis did not rule out the possibility that defendant experienced bleeding. Dr. Harper's assessment, or clinical impression, was "history of multiple blunt trauma." The doctor ordered X-rays of defendant's left leg and thoracic spine to rule out any small fracture or dislocation of the spine that might have resulted from the alleged attack. The X-rays were normal.

¶ 12    The circuit court found that defendant's statements to police and Assistant State's Attorney McCurry were voluntary and denied defendant's motion to suppress. The case then proceeded to a jury trial.

¶ 13    The State's evidence showed that on September 8, 1982, K.B., an admitted alcoholic, spent the day drinking with two friends at the apartment she shared with her boyfriend, Gene Edwards. The apartment was above a liquor store, located at 75th Street and South Jeffrey Street in Chicago, where Gene worked. A little after midnight, when the alcohol was exhausted, K.B.'s friends had left, and Gene was asleep, K.B. left the apartment intending to go to a friend's house on Paxton Street. K.B. testified that as she walked down 75th Street, a car with some black men inside pulled up to her; one of the men asked if she needed a lift. K.B. declined the offer. The next thing she remembered was being in the car.

¶ 14    Testimony established that the driver of the vehicle was Rodney Benson (also known as "Span"). Benson, defendant, and Bobby Joe Williams had driven from defendant's home,

---

[2]Lieutenant Crane was called as a witness during the hearing on Rodney Benson's motion to suppress statements, which was conducted at the same time as defendant's hearing on his motion to suppress. Defendant adopted the entirety of Crane's testimony.

located on the 7600 block of South Chappel Street, to the liquor store at 75th and Jeffrey streets to pick up beer. The men noticed K.B. staggering down 75th Street and, according to Williams, stopped to see what was wrong. Chicago Police Sergeant Elbert Harris, who was on patrol in the area, saw the group and stopped to investigate. Sergeant Harris noticed the smell of alcohol emanating from K.B. and that her speech was slurred. Harris asked K.B. if she needed to go to the hospital or the police station. K.B. told Harris that the men were helping her and that they were going to take her to a friend's house. After determining that the men were going to take K.B. where she wanted to go, Harris made a note of the license plate number and left.

¶ 15      According to Williams, after Benson drove off with K.B., he, defendant, and an unidentified black male with a bicycle walked back to defendant's home. Williams testified that shortly after arriving there, Benson pulled up to the rear of defendant's home. Benson carried K.B. to the attic, which was accessed by a staircase off of the kitchen. There, a bed was located under two small windows, which allowed in light from the streetlights. The attic had no other source of light.

¶ 16      K.B. testified that she was repeatedly raped, beaten and burned by a group of black men. Specifically, K.B. testified that one of the men punched her in the face, causing her to fall onto the bed. Three men in succession then had vaginal intercourse with her. A fourth man demanded oral sex. When K.B. refused, the man punched her, knocking her to the floor, and then punched her again. At some point, the man put his penis in her mouth. K.B. next remembered seeing flames coming at her face and being burned on her face and body, including her breasts. K.B. did not recognize her attackers, and she made no in-court identification of defendant as one of the men who assaulted her.

¶ 17      Williams testified that after Benson took K.B. upstairs, defendant and the bicycle rider went upstairs. Williams was also present in the attic from time to time as were Michael Fowler (also known as "Little Mike"), Lee Holmes, and Kenneth Lewis. Williams and Lewis both testified that they saw Benson, followed by Fowler, have sexual intercourse with K.B. Williams also testified that he saw defendant having sexual intercourse with K.B., and saw defendant hitting her. Williams further testified that he heard Holmes tell K.B. to "set her face out," meaning to suck his penis. Lewis testified that he also saw the bicycle rider have sexual intercourse with K.B., and that he heard K.B. say "no" more than once.

¶ 18      Lewis further testified that, at one point in the evening, defendant came downstairs from the attic and picked up a hot iron from the stove. Lewis took the iron from defendant. After defendant went back upstairs, Lewis heard "smacks and slaps." Lewis went upstairs and saw defendant beating K.B. with his fist. Three times Lewis pulled defendant off of K.B. Lewis said K.B. was not moving; he thought she was dead. Lewis left defendant's home for about 20 minutes to get some barbecue. When he returned, Lewis went to the attic and saw that K.B. was "burned from head to toe" and that there were iron marks on her breasts and legs. Later, Lewis saw defendant come downstairs, retrieve a hot spoon from the stove, and return upstairs. Lewis heard K.B. say, "Why are you burning me?" Williams similarly testified that he saw defendant pick up a hot iron from the kitchen stove and go upstairs. The next morning, defendant told Williams they "burned that bitch." Medical testimony established that K.B. suffered second and third degree burns to her face, neck, chest, breasts, thighs,

back, and buttocks, in addition to extensive bruising, particularly to her lower extremities.

¶ 19    K.B. further testified that during her ordeal, she passed out from the pain, later coming to on the floor. She then recalled hearing a man say, "Get the bitch out of here before we get a murder beef," or something to that effect. K.B. remembered a man dressing her and carrying her under her arms to the stairs. Her next recollection was being outside. K.B., not knowing where she was and her eyes swollen, crawled to the alley and made her way toward a light, which she later discovered was a gas station.

¶ 20    George Wilson, who was working the midnight shift at the gas station at 76th and Jeffrey streets on September 9, 1982, testified that he saw a white woman walking toward the station at 3 a.m. or 3:30 a.m. When she finally made her way to the station, he noticed that her eyes were bruised and her mouth was swollen and bloody. Wilson called police.

¶ 21    Investigation led police to defendant's home, where they arrived at about 4:30 a.m. Defendant's sister, Patricia Wrice, allowed police to enter. Other persons were present in the home, including defendant, Charles Wrice (defendant's brother), and Williams (Patricia Wrice's boyfriend). Once inside, police noticed a "burning odor" in the house, which was stronger in the kitchen. Police saw charred debris on the kitchen sink and on the floor, including a rolled-up paper that was burned. In the attic, police saw additional charred matter, and recovered a metal carving fork with a burnt tip, and a steam iron without the cord. The hole pattern on the steam iron matched many of the burn marks on K.B. Police also recovered from the attic a broken wooden hanger and certain articles of clothing, including panties and a shoe, that belonged to K.B.

¶ 22    As a result of their investigation that morning, police arrested several persons, including defendant, and transported them to Area 2 for questioning. Sergeant Byrne testified at trial that as defendant was placed in one of the second-floor interview rooms, defendant stated, "I'll tell you everything." A half-hour later, after Detective Dignan advised defendant of his *Miranda* rights, Byrne, Dignan, and Detective Dioguardi questioned defendant. According to Byrne, defendant related that on September 8, 1982, at about 11 p.m., he was walking home when he saw Benson sitting in a car with a woman. Williams was nearby, along with a police sergeant. Defendant heard Benson tell the sergeant that he was taking the woman to a girlfriend's house. After the sergeant left, defendant and Williams walked to defendant's home. Ten minutes later, Benson arrived and asked defendant if he could use a bed. Benson and the woman then went upstairs, followed at some point by Williams, Fowler, Lee Holmes, and another man. According to Byrne, defendant said that during this entire time he stayed downstairs in the living room. At some point, Fowler, Lee, another man, and the woman left.

¶ 23    Byrne denied having a second conversation with defendant, denied striking defendant, and denied knowing of any location at Area 2 that had abandoned jail cells or bars.

¶ 24    Assistant State's Attorney McCurry testified that after arriving at Area 2 on the morning of September 9, 1982, he spoke with Byrne, Dioguardi, and Dignan, and then interviewed four witnesses. At about 12:50 p.m., McCurry met defendant and advised him of his *Miranda* rights. Dioguardi and Dignan were present. McCurry's testimony as to the statement defendant then provided was substantially the same as the statement to which Byrne testified. McCurry spoke to defendant again at about 1:35 p.m., at defendant's request. According to

McCurry, defendant stated that the events previously described were correct up to the point where Benson and K.B. arrived at the house. Defendant told McCurry that after Benson took K.B. upstairs, he also went upstairs. Holmes and Fowler were present, along with a man who arrived on a bike. Defendant said Benson and the bicycle rider had sexual intercourse with K.B., and Benson was slapping and hitting K.B., demanding oral sex. Defendant also told McCurry that he saw Benson burn K.B. with an iron over most of her body and that he took the iron from Benson and dropped it on K.B.'s thighs.

¶ 25    The parties stipulated that police were unable to lift any prints off of the iron, hanger or fork recovered from the attic of defendant's home; the hanger had human blood, but the blood type could not be determined; the panties had blood, but whether it was human could not be determined; the fork and the iron did not have human blood; the tip of the fork was burned, and the tip was discolored either from chemicals or heat. Finally, the parties stipulated that the vaginal smears obtained from K.B. did not reveal the presence of spermatozoa.

¶ 26    Defendant testified in his defense that on September 8, 1982, he arrived home from work at about 10:45 p.m. Williams was at the house and Benson arrived about an hour later. The three men drove to the liquor store at 75th and Chappel streets in Benson's vehicle. While Benson looked for parking, defendant went into the liquor store and bought beer and cigarettes. When he left the store, he saw K.B. sitting in the front passenger seat of Benson's car, which was parked in the Chicken Coop restaurant lot. Williams and Sergeant Harris were also there. Defendant testified that K.B. had a black eye, and that Harris asked K.B. whether she wanted to go to the hospital or police station. K.B. told Harris no; she was going with Benson. Harris then left in his patrol car.

¶ 27    According to defendant, Benson drove off with K.B. and he and Williams walked back to defendant's house. A man with a bicycle, whom defendant earlier saw speaking with K.B. and Benson, followed behind defendant and Williams. Shortly after Williams and defendant arrived back at defendant's home, Williams answered a knock at the back door and called to defendant. Defendant saw Benson, K.B., and the bicycle rider on the back porch. Williams asked defendant if they could go upstairs and get high. Defendant told Williams he would have to clear it with Patricia Wrice, but when defendant returned to the living room, he heard people going upstairs. Defendant followed and saw Benson and K.B. sitting on the bed. The attic was dark and defendant could not see who else was there, but he heard Fowler's voice. After cautioning everyone not to mess up the area of the attic where he was doing some construction, defendant went downstairs to the living room.

¶ 28    After listening to Patricia argue with Williams about the late-night company, defendant left to call his fiancé, Jennifer. Defendant went to a nearby phone booth because his home did not have a telephone. Defendant spoke to Jennifer for 30 to 45 minutes. When defendant returned home, he fell asleep on the living room couch. Sometime later, Kim, a friend of Patricia Wrice, awakened defendant and told him that the people in the attic were fighting. Defendant went upstairs and saw Benson, Fowler, Holmes, and the bicycle rider. Another person was present but defendant could not see who it was. When defendant told everyone to leave, Benson grabbed him. Defendant broke free, found a hammer, and everyone ran downstairs. When defendant reached the kitchen, the only people he saw were Benson and

-8-

K.B. Benson and defendant had a brief exchange and then Benson left with K.B.

¶ 29 Defendant testified that after his arrest at his home later that morning, he was taken to a second-floor interview room at Area 2, where he was questioned by Detectives Dioguardi and Dignan. Defendant testified that police did not provide any *Miranda* warnings. According to defendant, the first time police questioned him, he "told them what happened from the time that [he] went to the store to the time [he] came back." Defendant did not tell police about Kim waking him up. Consistent with his testimony at the suppression hearing, defendant testified that Detective Dignan told him he was going to show him "some police brutality." Dignan and Byrne took defendant down some stairs into a room with bars. On his way downstairs, defendant saw Williams, who was crying.

¶ 30 Once downstairs, Dignan again asked defendant what happened. Defendant told Dignan that he told them what he knew upstairs. Dignan and Byrne then repeatedly struck defendant with a flashlight and a long piece of rubber. Defendant testified that Dignan kept asking him who burned and raped K.B. Defendant said things were happening quickly, he was confused, and could not remember everything that occurred. After Dignan and Byrne returned defendant upstairs, defendant saw Benson, who was crying and walking with a limp.

¶ 31 According to defendant, sometime later, Dignan and Byrne took defendant back downstairs. They told defendant that Benson had said defendant burned K.B. When defendant denied any involvement, Byrne and Dignan said he was lying and again beat him with the flashlight and rubber piece.

¶ 32 About 45 minutes after police brought defendant back to the second floor of Area 2, defendant spoke with Assistant State's Attorney McCurry. Dignan and Dioguardi were present. Defendant testified that he told McCurry the same thing he told police earlier about what happened from the time he went to the store to the time he returned home. Defendant could not remember what else he might have told McCurry at this time. Defendant testified that McCurry came back a second time and asked defendant if he had anything else to say. Defendant told him no.

¶ 33 Patricia Wrice, defendant's sister, testified she first became aware that a woman was upstairs when she was in the kitchen, sometime after midnight, and heard the woman say, "Get off of me, you can't fuck. Send the next one on." Patricia then saw Benson running down the stairs zipping his pants. During this time, defendant was in the living room. Patricia told Benson and Fowler, who was also in the kitchen, to leave, which they did. Shortly thereafter, defendant left to call Jennifer. Patricia returned to her bedroom and heard someone coming into the house. Patricia saw Benson and another man carrying a white woman out the door. Patricia denied telling investigators that she heard someone hitting another person upstairs, or that she heard someone on the second floor say, "You are going to suck my dick," or words to that effect.

¶ 34 Patricia also testified that while she was at Area 2 on the morning of September 9, 1982, she heard police beating her brother. She said she could hear her brother and another man hollering from the basement at different times. Patricia testified that police told her they would not hurt defendant too badly.

¶ 35 The paramedic who conducted defendant's intake physical at the Cook County jail on

September 10, 1982, and the physician who examined defendant on September 15, 1982, testified consistently with their testimony at the suppression hearing as to defendant's injuries and complaints on those dates.

¶ 36    The parties stipulated that Lieutenant John Crane, if called to testify, would testify regarding the old lockup area on the first floor of Area 2. The stipulation was substantially similar to Crane's testimony at the suppression hearing.

¶ 37    The jury, which was instructed on the principle of accountability, found defendant guilty of armed violence, two counts of aggravated battery, deviate sexual assault, unlawful restraint, and rape. The aggravated battery convictions merged with the armed violence conviction, and the trial court sentenced defendant to an extended 60-year term for rape, a consecutive 40-year term for deviate sexual assault, a concurrent 70-year term for armed violence, and a concurrent 5-year term for unlawful restraint. Defendant appealed.

¶ 38    The appellate court rejected defendant's sufficiency-of-the-evidence argument, relying on the eyewitness testimony of Williams and Lewis. *People v. Wrice*, 140 Ill. App. 3d 494, 498-99 (1986). The appellate court did not consider defendant's inculpatory statement to police, omitting any reference to his statement in its recitation of the trial evidence and in its analysis. *Id.* The appellate court also vacated defendant's convictions and sentences for unlawful restraint and armed violence based on the one-act, one-crime rule. *Id.* at 501-02. The rape and deviate sexual assault convictions remained intact, along with the combined 100-year sentence.

¶ 39    In 1991, defendant filed a *pro se* postconviction petition alleging, in relevant part, that his rights under the fifth and eighth amendments to the federal constitution were violated in that Sergeant Byrne and Detective Dignan beat defendant while he was in custody at Area 2. The trial court summarily dismissed defendant's petition; the appellate court affirmed. *People v. Wrice*, No. 1-91-2332 (1994) (unpublished order under Supreme Court Rule 23). The appellate court reviewed the testimony from the suppression hearing (although omitting any mention of Lieutenant Crane's testimony and defendant's testimony) and concluded that the trial court's determination as to the voluntariness of defendant's statements was not manifestly erroneous. *Id.*

¶ 40    In 2000, defendant filed a successive *pro se* postconviction petition alleging violations of his due process rights under both the federal and state constitutions, all related to his claim that Sergeant Byrne and Detective Dignan beat him while in custody at Area 2. In support, defendant cited the report from the Chicago police department's Office of Professional Standards (OPS), establishing that abuse of prisoners and coerced confessions at Area 2 were widespread and systematic. Defendant argued that the new evidence of abuse and beatings practiced at Area 2 by Sergeant Byrne and Detective Dignan would have increased the likelihood that his coerced statements would have been suppressed and the outcome of his trial would have been different. The circuit court appointed counsel for defendant. Counsel did not file an amended petition, but did file a partial response to the State's motion to dismiss. In her response, defense counsel made plain that the OPS investigations, chronicled in the reports of OPS Investigators Goldston and Sanders, identified Byrne and Dignan as "players" in the systematic abuse at Area 2. The circuit court granted the State's motion to

dismiss, finding the petition was untimely and did not satisfy the criteria for consideration of a successive petition. The circuit court denied defendant's motion to reconsider. The appellate court affirmed. *People v. Wrice*, No. 1-01-1697 (2003) (unpublished order under Supreme Court Rule 23).

¶ 41 In October 2007, defendant filed a petition for leave to file a successive petition for postconviction relief, which is the subject of this appeal. In his petition for leave to file, defendant maintained that newly discovered evidence substantiated his prior claim that he was severely beaten and forced to confess to a crime he did not commit, in violation of his fourth, fifth, sixth and fourteenth amendment rights. In support, defendant cited the Report of the Special State's Attorney, Edward J. Egan, who was appointed in 2002 by the presiding judge of the criminal division of the circuit court of Cook County to investigate allegations of torture, perjury, obstruction of justice, conspiracy to obstruct justice, and other offenses by police officers under the command of Jon Burge at Area 2 and Area 3 police headquarters beginning in 1973. Defendant attached portions of the report to his petition.[3] In his petition, defendant noted that Egan's report concluded that three cases existed which would justify indictments for mistreatment of prisoners by Chicago police officers. Those cases were based on the complaints of Andrew Wilson,[4] Alfonzo Pinex, and Phillip Adkins. The report concluded, however, that many other cases led investigators to believe or suspect that the claimants were abused, but proof beyond a reasonable doubt was absent. Defendant also noted that the report concluded that Jon Burge was guilty of prisoner abuse and that "[i]t necessarily follows that a number of those serving under his command recognized that, if their commander could abuse persons with impunity, so could they." Defendant further noted that the report concluded that the "inter-office procedures followed by the State's Attorney's Office and the Chicago Police Department during at least the tenure of Jon Burge at Areas 2 and 3 were inadequate in some respects."

¶ 42 Defendant argued that he satisfied the "cause" portion of the cause-and-prejudice test because Egan's report was not released to the general public until July 19, 2006, and that he did not receive a copy of the report until February or March 2007. Defendant also argued that he established prejudice, explaining that without his confession and Williams' testimony (which defendant also claimed was coerced), the remaining evidence was insufficient to convict.

¶ 43 The trial court denied defendant leave to file his second successive postconviction petition. The appellate court reversed and remanded for a third-stage evidentiary hearing. 406 Ill. App. 3d at 53. The appellate court held that defendant could not have argued that the

---

[3]The circuit court record was supplemented with the complete 292-page report on compact disc. The disc also contains individual reports in several cases investigated by the Special State's Attorney, including defendant's case.

[4]This is the same Andrew Wilson who was the defendant in *People v. Wilson*, 116 Ill. 2d 29 (1987), where this court, as discussed *infra* in section III of this opinion, ordered a new trial based on the State's failure to prove that the injuries Wilson sustained while in police custody were not inflicted as a means of obtaining his confession.

Special State's Attorney's report corroborated his claims of police torture in his postconviction petitions filed in 1991 and 2000 because the report was not released until 2006. Defendant thus satisfied the "cause" prong of the cause-and-prejudice test. *Id.* at 52. As to the "prejudice" prong of the test, the appellate court initially observed that " '[t]he use of a defendant's coerced confession as substantive evidence of his guilt is *never* harmless error.' (Emphasis added.) *People v. Wilson*, 116 Ill. 2d 29, 41 (1987)." *Id.* at 53. The appellate court determined that, similar to the defendant in *People v. Patterson*, 192 Ill. 2d 93 (2000), defendant has:

> "(1) consistently claimed, during his motion to suppress, at trial, and on postconviction review, that he was tortured; (2) his claims of being beaten are strikingly similar to those of other prisoners at Areas 2 and 3; (3) the officers involved, Sergeant Byrne and Detective Dignan, are identified in other allegations of torture; and (4) defendant's allegations are consistent not only with OPS findings (under the preponderance of the evidence standard of proof) of systemic and methodical torture at Area 2 under Jon Burge, but also with the [Special State's Attorney's] Report's findings of torture under the stricter standard of proof beyond a reasonable doubt. As such, defendant has satisfied the 'prejudice' prong of the cause-and-prejudice test." *Id.*

¶ 44 We allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010); Ill. S. Ct. R. 612 (eff. Sept. 1, 2006). We also allowed The Chicago Innocence Project and "Persons Concerned about the Integrity of the Illinois Criminal Justice System" to file briefs *amicus curiae* in support of defendant. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010); Ill. S. Ct. R. 612 (eff. Sept. 1, 2006).

¶ 45                                          ANALYSIS
¶ 46                                             I
¶ 47 The Post-Conviction Hearing Act (Act) provides a method by which defendants may assert that, in the proceedings which resulted in their convictions, there was a substantial denial of their federal and/or state constitutional rights. 725 ILCS 5/122-1 (West 2010). A proceeding under the Act is a collateral attack on the judgment of conviction. *People v. Mahaffey*, 194 Ill. 2d 154, 170 (2000). Where, as here, a defendant seeks to institute a successive postconviction proceeding, the defendant must first obtain leave of court. 725 ILCS 5/122-1(f) (West 2010); *People v. Tidwell*, 236 Ill. 2d 150, 157 (2010); *People v. LaPointe*, 227 Ill. 2d 39, 44 (2007).

¶ 48 Leave of court may be granted only if the defendant demonstrates "cause" for his or her failure to bring the claim in his or her initial postconviction proceeding and "prejudice" resulting therefrom. See 725 ILCS 5/122-1(f) (West 2010) (codifying the cause-and-prejudice test articulated in *People v. Pitsonbarger*, 205 Ill. 2d 444, 458-60 (2002)); *Tidwell*, 236 Ill. 2d at 161 (whether leave is granted is a determination dependent upon a defendant's satisfaction of the cause-and-prejudice test). A defendant shows cause "by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings." 725 ILCS 5/122-1(f) (West 2010). A defendant shows

prejudice "by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." *Id.*

¶ 49 The State concedes that defendant has satisfied the cause prong, challenging only the appellate court's determination that defendant also satisfied the prejudice prong. On this issue, the State argues that the *per se* rule set forth in *Wilson*, that "use of a defendant's coerced confession as substantive evidence of his guilt is never harmless error" (*Wilson*, 116 Ill. 2d at 41), is no longer good law in light of *Arizona v. Fulminante*, 499 U.S. 279 (1991), and, thus, the appellate court erred in relying on *Wilson*. The State posits that under *Fulminante*, admission of a coerced confession is subject to harmless-error review, and that under any definition of harmless error, admission of defendant's allegedly coerced confession was harmless beyond a reasonable doubt. Thus, the State urges this court to reverse the appellate court judgment and affirm the trial court's order denying defendant leave to file his second successive postconviction petition.

¶ 50 Because the State's arguments raise purely legal issues, our review proceeds *de novo*. *People v. Johnson*, 206 Ill. 2d 348, 359 (2002); see also *People v. Johnson*, 191 Ill. 2d 257, 268 (2000) (sufficiency of the allegations contained in a postconviction petition is reviewed *de novo*).

¶ 51                                                II

¶ 52 Before considering the State's principal argument, we address what the State maintains is an inconsistency in defendant's claim. The State notes that although defendant argues that his confession should have been suppressed as the product of police violence, he has also consistently maintained that he did not confess.

¶ 53 The law is settled that a defendant's assertion that he did not confess does not preclude the alternative argument that any confession should be suppressed. *People v. Norfleet*, 29 Ill. 2d 287, 289-91 (1963); accord *People v. Manning*, 182 Ill. 2d 193, 205 (1998); see also *Ashcraft v. Tennessee*, 322 U.S. 143, 152 n.7 (1944) ("The use in evidence of a defendant's coerced confession cannot be justified on the ground that the defendant has denied he ever gave the confession.").

¶ 54 In *People v. Hobley*, 182 Ill. 2d 404 (1998), cited by the State, we rejected the defendant's postconviction claim that new evidence of police brutality at Area 2 would have caused the jury to conclude that the defendant's confessions, which he denied making, were coerced. *Id.* at 450. We noted that the defendant's argument was contrary to the position he took at trial, where his "primary challenge to the confessions was that they were fabricated by police." *Id.* We concluded that evidence that other suspects were allegedly coerced into confessing "would not have directly aided that position." *Id.* Our conclusions in *Hobley*, based on a review of the record and arguments in that case, should not be construed as an abrogation of *Norfleet*. Evidence of coercion is not rendered irrelevant simply because the defendant has denied confessing. Thus, defendant here is entitled to press his claim that his confession was coerced.

¶ 55 We now turn to *Wilson*.

¶ 56                                                    III

¶ 57        *Wilson* was a direct appeal in a capital case and the first Area 2 police brutality case to reach this court. The defendant argued on appeal that his statement to police, in which he admitted to shooting two police officers, should have been suppressed as involuntary. The defendant testified that "he was punched, kicked, smothered with a plastic bag, electrically shocked, and forced against a hot radiator" until he confessed. *Wilson*, 116 Ill. 2d at 35. The defendant, who was treated in a hospital emergency room the same day that he confessed, provided medical testimony and photographic evidence substantiating his injuries. We held that the State failed to establish, by clear and convincing evidence, that the injuries the defendant sustained while in police custody were not inflicted as a means of producing the confession, and the defendant's statement should have been suppressed as involuntary. *Id.* at 41. We reversed and remanded for a new trial because "[t]he use of a defendant's coerced confession as substantive evidence of his guilt is never harmless error." *Id.* In support of this *per se* rule, we cited *Payne v. Arkansas*, 356 U.S. 560 (1958), *Chapman v. California*, 386 U.S. 18 (1967), and *Rose v. Clark*, 478 U.S. 570 (1986).

¶ 58        In *Payne*, a capital case, the Supreme Court reversed the defendant's murder conviction and remanded for a new trial. *Payne*, 356 U.S. at 569. The Court held that the confession of the defendant, a "mentally dull" 19-year-old who was arrested without a warrant, denied a hearing before a magistrate, not advised of his right to counsel and to remain silent, held incommunicado for three days, denied food for long periods, and threatened by the chief of police with mob violence against him, was not voluntary. *Id*. at 567. The Court rejected the State's argument that because there was adequate evidence of guilt, apart from the confession, the jury's verdict should be sustained. *Id.* at 567-68. The Court explained:

> "[W]here, as here, a coerced confession constitutes a part of the evidence before the jury and a general verdict is returned, no one can say what credit and weight the jury gave to the confession. And in these circumstances this Court has uniformly held that even though there may have been sufficient evidence, apart from the coerced confession, to support a judgment of conviction, the admission in evidence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment." *Id.* at 568.

¶ 59        In *Chapman*, the Court declined to adopt a rule that all errors of federal constitutional dimension require automatic reversal of a criminal conviction. *Chapman*, 386 U.S. at 21-22. The Court concluded that some constitutional errors, in the setting of a particular case, are so "unimportant and insignificant" that they may, consistent with the federal constitution, be deemed harmless beyond a reasonable doubt. *Id.* at 22-24. The Court recognized, however, that "prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Id.* at 23. The Court cited *Payne*, along with *Gideon v. Wainwright*, 372 U.S. 335 (1963) (right to counsel), and *Tumey v. Ohio*, 273 U.S. 510 (1927) (right to an impartial judge). *Id.* at 23 n.8. The Court further held that the error at issue–the prosecutor's improper comment on the defendants' silence–was not harmless. *Id.* at 24.

¶ 60        Finally, in the *Rose* case, the Court reviewed the harmless-error doctrine in relation to

an erroneous jury instruction, holding that the instructional error at issue "does not compare with the kinds of errors that automatically require reversal of an otherwise valid conviction." *Rose*, 478 U.S. at 579. The Court explained:

> "Despite the strong interests that support the harmless-error doctrine, the Court in *Chapman* recognized that some constitutional errors require reversal without regard to the evidence in the particular case. [Citations.] This limitation recognizes that some errors necessarily render a trial fundamentally unfair." *Id.* at 577.

The Court observed that each of the examples *Chapman* cited of errors that could never be harmless either "aborted the basic trial process" (by admission of a coerced confession), or "denied it altogether" (by denial of counsel, or by trial before a biased adjudicator). *Id.* at 578 n.6.

¶ 61        As the foregoing discussion demonstrates, the rule set forth in *Wilson*, that "use of a defendant's coerced confession as substantive evidence of his guilt is never harmless error" (*Wilson*, 116 Ill. 2d at 41), is simply an iteration of the Supreme Court's pronouncements in *Payne*, *Chapman*, and *Rose*. See also *Lynumn v. Illinois*, 372 U.S. 528, 537 (1963) (where the Court, relying on *Payne*, held that the trial court's view that admission of the defendant's coerced confession could be harmless error is an "impermissible doctrine"). *Wilson*, however, predates *Arizona v. Fulminante*, 499 U.S. 279 (1991), in which the Supreme Court considered whether the admission at trial of a coerced confession is subject to harmless-error analysis. *Fulminante*, 499 U.S. at 285.

¶ 62        *Fulminante* involved the 1982 murder of the defendant's 11-year-old stepdaughter. The defendant, while in federal prison on unrelated charges, befriended a fellow inmate, Anthony Sarivola, who was a paid informant for the Federal Bureau of Investigation (FBI), masquerading as an organized-crime figure. Sarivola knew the defendant was starting to get some "tough treatment" from fellow inmates who heard rumors that the defendant was suspected of killing a child. *Id.* at 283. Sarivola offered to provide protection if the defendant told him the truth regarding the circumstances of his stepdaughter's death. The defendant told Sarivola how he had killed the girl, and the defendant was subsequently charged with her murder. The defendant's motion to suppress the statement he had made to Sarivola was denied, and the defendant was convicted of the girl's murder. The Arizona high court held that the confession was coerced, and because harmless-error analysis was precluded by Supreme Court precedent, the Arizona court reversed the defendant's conviction and remanded for a new trial without the use of the confession. *State v. Fulminante*, 778 P.2d 602, 627 (Ariz. 1988). The Supreme Court affirmed the reversal, but for different reasons. *Fulminante*, 499 U.S. at 285. In a fractured opinion, the Supreme Court decided three issues, each issue commanding a different five-justice majority.

¶ 63        The Court first considered whether the defendant's confession had been coerced.[5] Justice White, joined by Justices Marshall, Blackmun, Stevens, and Scalia, agreed with the Arizona

---

[5]The Supreme Court uses the terms "coerced confession" and "involuntary confession" interchangeably as a convenient shorthand. The Court used the former term in *Fulminante* because that was the term used by the Arizona Supreme Court. *Fulminante*, 499 U.S. at 287 n.3.

Supreme Court that the defendant's confession was, indeed, coerced. *Id.* at 287. Chief Justice Rehnquist, joined by Justices O'Connor, Kennedy, and Souter, dissented. *Id.* at 303-06 (Rehnquist, C.J., dissenting, joined by O'Connor, Kennedy and Souter, JJ.).

¶ 64    The Court next considered whether harmless-error analysis applies to the admission of coerced confessions. The four dissenting justices who believed the confession was not coerced, joined by Justice Scalia, who believed it was coerced, determined that coerced confessions are subject to harmless-error analysis. *Id.* at 310. Chief Justice Rehnquist wrote for this majority.[6]

¶ 65    Finally, the Court considered whether the admission of the defendant's coerced confession was harmless. Justice Souter did not vote on this issue, which the Court resolved by a 5-3 vote in favor of the defendant. Justice White, who wrote for the majority, was joined by Justices Marshall, Blackmun, and Stevens. These four justices, who voted as a block on all three issues, agreed that although harmless-error analysis should not apply to coerced confessions, the admission of the defendant's confession was not harmless. *Id.* at 296. The fifth vote in favor of this result was provided by Justice Kennedy. Although Justice Kennedy believed that admission of the defendant's confession was not error, its admission was not harmless. *Id.* at 313-14 (Kennedy, J., concurring in the judgment).[7] Thus, although five justices (Chief Justice Rehnquist and Justices Scalia, O'Connor, Kennedy, and Souter) believed the defendant's conviction should stand, either because the confession was not coerced or because its admission was harmless error, the Court affirmed the reversal of the defendant's conviction.

¶ 66    In deciding the reach of *Fulminante* with respect to the present case, we necessarily focus our attention on the second issue the Court considered: the applicability of harmless-error analysis to coerced confessions. Chief Justice Rehnquist, writing for the majority, distinguished between a classic "trial error" and a "structural defect[ ] in the constitution of the trial mechanism." *Id.* at 307-09 (Rehnquist, C.J.). A "trial error" is an error which "occurred during the presentation of the case to the jury, and which may therefore be

---

[6]Chief Justice Rehnquist acknowledged that "the opinion on whether or not harmless error applied to coerced confessions *** is technically dicta." Chief Justice William Rehnquist, Remarks at the 61st Judicial Conference, United States Judges of the Fourth Circuit, Opening Session, June 28, 1991, vol. I, at 19. Similarly, a legal commentator observed that "harmless-error analysis was essential to the vote of only one of the Justices in the majority [Justice Scalia] and therefore cannot be considered a holding." Lewis J. Liman, *Fulminante*, 205 N.Y.L.J. 30 (April 3, 1991).

[7]Justice Kennedy's vote led one commentator to conclude that "it undermines the legitimacy of the Court" because the "actual result of the case [to affirm the reversal of Fulminante's conviction] did not have the support of the majority." Kenneth R. Kenkel, Note, *Arizona v. Fulminante: Where's the Harm in Harmless Error?*, 81 Ky. L.J. 257, 279 (1993). But see Edward A. Hartnett, *A Matter of Judgment, Not a Matter of Opinion*, 74 N.Y.U. L. Rev. 123, 144 (1999) ("If, however, Justices Rehnquist, O'Connor, Kennedy, and Souter had not reached out to opine about issues unnecessary to their vote on the judgment, Justice Kennedy would never have been tempted to change his vote.").

-16-

quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Id.* at 307-08. In contrast, a "structural defect" defies harmless-error analysis because it affects the entire conduct of the trial from beginning to end. *Id.* at 309-10. Structural defects identified by the Court since *Chapman* was decided include the unlawful exclusion of members of the defendant's race from a grand jury (*Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986)); deprivation of the right to self-representation (*McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984)); and deprivation of the right to a public trial (*Waller v. Georgia*, 467 U.S. 39, 49 n.9 (1984)). *Fulminante*, 499 U.S. at 310.

¶ 67        Chief Justice Rehnquist determined that the admission of an involuntary statement or confession is "similar in both degree and kind to the erroneous admission of other types of evidence" and is thus a trial error subject to harmless-error review. *Id.* The Chief Justice found the evidentiary impact of a coerced confession to be "indistinguishable" from the evidentiary impact of a confession obtained in violation of the sixth amendment, or of evidence seized in violation of the fourth amendment, or of a prosecutor's improper comment on a defendant's silence in violation of the fifth amendment. *Id.* Observing that the Court has applied harmless-error analysis to the violation of other similarly important constitutional rights "involving the same level of police misconduct" as that at issue in *Fulminante* (*id.* at 311), the Chief Justice concluded:

> "The inconsistent treatment of statements elicited in violation of the Sixth and Fourteenth Amendments, respectively, can be supported neither by evidentiary or deterrence concerns nor by a belief that there is something more 'fundamental' about involuntary confessions. This is especially true in a case such as this one where there are no allegations of physical violence on behalf of the police." *Id.*

¶ 68        Although acknowledging that an involuntary confession may have "a more dramatic effect" on a trial than other errors and may even be "devastating" to a particular defendant, the Chief Justice did not consider this to be a reason to eschew harmless-error review. *Id.* at 312.

¶ 69        Justice White, writing in dissent, also recognized the damning effect of the admission of a defendant's confession at trial:

> "A defendant's confession is 'probably the most probative and damaging evidence that can be admitted against him,' [citation] so damaging that a jury should not be expected to ignore it even if told to do so, [citation] and because in any event it is impossible to know what credit and weight the jury gave to the confession." *Id.* at 292 (White, J., dissenting).

¶ 70        While Chief Justice Rehnquist focused on the truth-seeking function of a trial, *i.e.*, the factual determination of a defendant's guilt or innocence (*id.* at 308, 310 (Rehnquist, C.J.)), Justice White expressed the view that the right of a defendant not to have his coerced confession used against him protects important values unrelated to the search for the truth (*id.* at 295 (White, J., dissenting)). Justice White wrote:

> "[S]ome coerced confessions may be untrustworthy. [Citation.] Consequently, admission of coerced confessions may distort the truth-seeking function of the trial

upon which the majority focuses. More importantly, however, the use of coerced confessions, 'whether true or false,' is forbidden 'because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system–a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused of his own mouth,' [citations]. This reflects the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will,' [citation] as well as 'the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminal as from the actual criminals themselves,' [citation]. Thus, permitting a coerced confession to be part of the evidence on which a jury is free to base its verdict of guilty is inconsistent with the thesis that ours is not an inquisitorial system of criminal justice." *Id.* at 293-94.

Justice White concluded that use of a coerced confession aborts the basic trial process and renders a trial fundamentally unfair. *Id.* at 295. Of the numerous Supreme Court opinions Justice White cited in support of his position (*id.* at 288-89), none were expressly overruled by the Rehnquist majority.

¶ 71    In light of *Fulminante*, the rule set forth in *Wilson*, that "use of a defendant's coerced confession as substantive evidence of his guilt is never harmless error" (*Wilson*, 116 Ill. 2d at 41), cannot stand as a matter of federal constitutional law.[8] That said, we conclude that *Fulminante* does not mandate that we abandon the rule in its entirety. Rather, we may recast the rule as follows: use of a defendant's *physically* coerced confession as substantive evidence of his guilt is never harmless error.[9]

¶ 72    Our conclusion that the *Wilson* rule still has some vitality flows from the fact that, in *Fulminante,* the defendant's confession to his cellmate, an FBI informant, was not the product of physical coercion. Rather, the facts demonstrated that the motivating factor in the defendant's confession was the fear of violence, absent protection from the defendant's cellmate. *Fulminante*, 499 U.S. at 288. The Court did not need to decide whether admission of a confession that is the result of physical abuse, violence, or torture is subject to harmless-error review. Indeed, Chief Justice Rehnquist distinguished *Fulminante* from cases involving physical coercion, stating that application of harmless error is "especially true in a case such as this one *where there are no allegations of physical violence on behalf of the police*." (Emphasis added.) *Id.* at 311. Thus, the Chief Justice confined his analysis to harmless-error

---

[8] Whether the *Wilson* rule could stand as a matter of state constitutional law is not before us because defendant here has only claimed violations of his rights arising under the federal constitution.

[9] We need not, in the context of the present case, arrive at a comprehensive definition of "physical coercion," because under any definition, the beatings alleged by defendant here would qualify.

cases involving "the same level of police misconduct" as that at issue in *Fulminante*, citing, as a representative case, *Milton v. Wainwright*, 407 U.S. 371 (1972). *Id. Milton* involved the admission of the defendant's confession to an undercover police officer in violation of the defendant's sixth amendment right to counsel–a scenario far removed from the present case.

¶ 73    However one might measure the level of police misconduct in a given case, we think it suffices to say that *Fulminante* did not involve the same level of police misconduct alleged in this case–beatings perpetrated by two police officers who figured prominently in the systematic abuse and torture of prisoners at Area 2 police headquarters. We believe that this type of coercion by the state is qualitatively different from the coercion that was at issue in *Fulminante* and constitutes an egregious violation of an underlying principle of our criminal justice system about which Justice White spoke–"that ours is an accusatorial and not an inquisitorial system." *Id.* at 293 (White, J., dissenting). As expressed in *Ashcraft v. Tennessee*, 322 U.S. 143 (1944):

> "The Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession. There have been, and are now, certain foreign nations with governments dedicated to an opposite policy: governments which convict individuals with testimony obtained by police organizations possessed of an unrestrained power to seize persons suspected of crimes against the state, hold them in secret custody, and wring from them confessions by physical or mental torture. So long as the Constitution remains the basic law of our Republic, America will not have that kind of government." *Ashcraft*, 322 U.S. at 155.

In sum, without additional guidance from the Supreme Court, we will not assume that the five justices in *Fulminante* who determined that the harmless-error rule applies to coerced confessions intended the rule to apply in cases such as the one now before us, involving alleged police brutality and torture.

¶ 74    Citing *People v. Mahaffey*, 194 Ill. 2d 154 (2000), the State argues that the method of coercion is not a basis on which to distinguish this case from *Fulminante*. In *Mahaffey*, the defendant claimed, on postconviction review, that newly discovered evidence corroborated his pretrial claim that his confession was the product of police abuse at Area 2 and should have been suppressed. We held that the defendant was not entitled to an evidentiary hearing on this claim. *Id.* at 179.

¶ 75    The State is correct that in *Mahaffey* we considered the overwhelming evidence of the defendant's guilt, concluding that the result of his trial would not have been different had the defendant's confession not been admitted. *Id.* Although this analysis suggests this court was conducting harmless-error review, *Mahaffey* never employs the term "harmless error" or the phrase "harmless beyond a reasonable doubt." In any event, whether harmless-error review is applicable to the erroneous admission of a coerced confession was not before us when we decided *Mahaffey*. Indeed, *Mahaffey* contains no discussion, or even a mention, of *Wilson* or *Fulminante*. Thus, we disagree with the State that our decision in *Mahaffey* necessarily militates in favor of applying harmless-error analysis in the instant case. To the extent *Mahaffey* may be read as implicitly adopting harmless-error review for admission of coerced

-19-

confessions, it is overruled.

¶ 76    The State argues that other jurisdictions have applied harmless-error review to claims of physically coerced confessions, urging this court to do the same. See *Hinton v. Uchtman*, 395 F.3d 810 (7th Cir. 2005); *United States v. Alwan*, 279 F.3d 431 (7th Cir. 2002); *Howard v. City of Chicago*, No. 03 C 8481, 2004 WL 2397281 (N.D. Ill. 2004); *Patterson v. Burge*, 328 F. Supp. 2d 878 (N.D. Ill. 2004); *Key v. Artuz*, No. 99-CV-161, 2002 WL 31102627 (E.D.N.Y. 2002); *Zuliani v. Texas*, 903 S.W.2d 812 (Tex. App. 1995).

¶ 77    In *Howard* and *Patterson*, although the underlying cases involved claims of police brutality, the issue before the federal district court was the timeliness of the defendants' federal civil rights actions. In the context of determining when their causes of action accrued, the court, without discussion, observed that a coerced confession is subject to harmless-error review, citing *Fulminante*. *Howard*, 2004 WL 2397281 at *6; *Patterson*, 328 F. Supp. 2d at 896. *Howard* and *Patterson* do not persuade us that harmless-error analysis is required in the present case, which involves a challenge to defendant's conviction and not a limitations issue.

¶ 78    *Key* and *Alwan* are also not persuasive. *Key* involved the defendant's *habeas corpus* claim that his confession was the product of physical coercion by police. *Alwan* involved a challenge to the admission of the defendant's confession, allegedly obtained through duress and torture in Israel, at the defendant's trial for contempt of court. Although in both cases the federal court, in cursory fashion, applied the harmless-error rule of *Fulminante*, in neither case was such an application necessary to the opinion. In *Key*, the federal district court had already determined that the defendant's confession was not coerced (*Key*, 2002 WL 31102627 at *7), and in *Alwan* the federal appeals court, which conducted plain-error review, had already found no error (*Alwan*, 279 F.3d at 438).

¶ 79    In *Zuliani*, also cited by the State, the Texas Court of Appeals applied *Fulminante* on direct appeal, holding that admission of the defendant's confession, which was coerced through physical violence and threat of harm by police, was not harmless. The Texas court observed that one of the difficulties in applying *Fulminante*, which the court termed an "unusually structured opinion" (*Zuliani*, 903 S.W.2d at 824), is that the Supreme Court uses the terms "coerced confession" and "involuntary confession" interchangeably (*id.* at 823 (quoting *Fulminante*, 499 U.S. at 287 n.3)). The Texas court also observed, as we have, that (1) the coercion or involuntariness at issue in *Fulminante* was not the result of physical violence; (2) Chief Justice Rehnquist "noted the propriety of applying harmless error analysis 'where there are no allegations of physical violence on behalf of the police' "; and (3) the Supreme Court was not required to decide whether harmless-error analysis applies to violence-induced confessions. *Id.* (quoting *Fulminante*, 499 U.S. at 311). The Texas court continued:

> "Due to increasing police sophistication in the modern era, in the usual case it is psychological rather than physical coercion that is the claimed abuse. [Citation.] The present case, however, is a throwback to earlier practices that combine physical and psychological coercion. [Citation.] Without clearer directions, we conclude that we must apply a harmless error analysis in light of *Fulminante*." *Id.* at 823-24.

-20-

¶ 80    The Texas Court of Appeal's struggle, in deciding whether harmless-error analysis should apply to a confession induced in part by physical violence, reinforces our belief that the issue of federal constitutional law before this court is not as settled as the State here would argue.

¶ 81    Finally, in *Hinton*, the federal appeals court considered the defendant's petition for *habeas corpus* relief, in which he cited newly discovered evidence that his signed confession was obtained through police brutality at Area 2 headquarters. Lieutenant Jon Burge was in charge of Hinton's interrogation. The defendant had testified that police officers physically beat him, smothered him, and electrocuted him, but produced no physical or other evidence in support of his claim. The trial court did not find his testimony credible. The federal appeals court affirmed the district court's denial of the defendant's *habeas* petition. *Hinton*, 395 F.3d at 819. Citing *Fulminante*, the federal court determined that the admission of the defendant's confession–assuming it was coerced–was harmless "due to the wealth of other corroborating evidence" at trial establishing the defendant's guilt beyond a reasonable doubt. *Id.* at 820.

¶ 82    Judge Wood, in her concurrence, found it "somewhat disturbing," given the gravity of the problem of police abuse at Area 2, to use the label of "harmless error." *Id.* at 823 (Wood, J., concurring). Judge Wood observed that the Chicago police department's OPS reports, which detail the abuse at Area 2, contain language "reminiscent of the news reports of 2004 concerning the notorious Abu Ghraib facility in Iraq" (*id.* at 822), and that the conduct attributed to Burge, if proven, would violate the prohibitions in the United Nations Convention Against Torture, as well as the "fundamental human rights principles that the United States is committed to uphold" (*id.* at 823). Although Judge Wood knew of "no clearly established Supreme Court case that would have required the state court to recognize the error as structural in nature," Judge Wood also acknowledged that the Supreme Court has never used the harmless-error doctrine in a coerced confession case where the coercion rose to the level of torture. *Id.*

¶ 83    *Hinton*, like *Zuliani*, reinforces our belief that *Fulminante* did not decide the issue of federal constitutional law squarely before us in the present case. See also *United States v. Slater*, 971 F.2d 626, 636 (10th Cir. 1992) (citing *Fulminante* for the proposition that absent "allegations of physical violence on behalf of the police, admission of an involuntary confession is subject to harmless error analysis"); *United States v. Jenkins*, 938 F.2d 934, 942 (9th Cir. 1991) ("Because the Court was not faced with facts that necessitated its passing on whether harmless-error analysis applies even to brutality-induced confessions, it is unclear whether the Court intended to reach that issue in *Fulminante*.").

¶ 84    Accordingly, we hold that harmless-error analysis is inapplicable to defendant's postconviction claim that his confession was the product of physical coercion by police officers at Area 2 headquarters. The *per se* rule in *Wilson*, as modified above, stands: use of a defendant's physically coerced confession as substantive evidence of his guilt is never harmless error. Defendant has satisfied the prejudice prong of the cause-and-prejudice test.

¶ 85    We reject the State's argument that a *per se* rule will encourage frivolous claims of coerced confessions in successive postconviction petitions because of the purported ease with

which a defendant may now establish prejudice. The State's argument overlooks that a defendant must first establish "cause" for not raising the claim during his or her initial postconviction proceedings. 725 ILCS 5/122-1(f) (West 2010). To establish cause, a defendant must identify "an objective factor that impeded his or her ability to bring the claim in his or her initial postconviction proceedings." *Id.* Thus, a bare assertion that the defendant's confession was physically coerced will not establish "cause" for purposes of the cause-and-prejudice test, and the *per se* rule will never come into play. See *Pitsonbarger*, 205 Ill. 2d at 460-62. In cases, such as the present one, where the defendant does satisfy both prongs of the cause-and-prejudice test, the defendant is yet required to establish the allegations set forth in his postconviction petition. Satisfaction of the test merely allows the petition to proceed; it does not relieve the defendant of his evidentiary burden in the postconviction proceeding.

¶ 86                                              IV

¶ 87      Apart from its argument concerning the applicability of harmless-error review, the State advances no other argument or reason as to why defendant's postconviction petition should not proceed. Accordingly, the only matter remaining is the proper disposition of this case. The appellate court remanded the matter for a third-stage evidentiary hearing on defendant's second successive postconviction petition. 406 Ill. App. 3d at 53. The trial court's order from which defendant sought review, however, merely denied defendant leave to file his postconviction petition. In an effort not to "short circuit" the process, we remand this matter for appointment of postconviction counsel and second-stage proceedings. See *People v. Edwards*, 197 Ill. 2d 239, 244-46 (2001) (detailing the three stages of postconviction proceedings).

¶ 88      In its *amicus* brief, the Chicago Innocence Project requests that this court instruct the trial court to permit amendment of defendant's petition to include a claim of actual innocence based on affidavits it has secured from Williams, Benson, and Fowler.[10] Defendant, however, has not requested such relief before this court. Whether amendment of defendant's postconviction petition is desirable is an issue properly considered in the first instance by defendant and his appointed counsel. See *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006) (describing duties of appointed counsel at the second stage of postconviction proceedings).

¶ 89                                        CONCLUSION

¶ 90      For the reasons stated, we affirm, as modified, the judgment of the appellate court reversing the trial court's order denying defendant leave to file his second successive postconviction petition and remand to the trial court for appointment of postconviction counsel and second-stage postconviction proceedings.

---

[10]Photocopies of the three affidavits are appended to the *amicus* brief. In his affidavit, Williams recants his trial testimony. Benson, who did not testify at defendant's trial, states in his affidavit that he never saw defendant punch or burn K.B. Fowler, who also did not testify, states in his affidavit that he did not see defendant in the upstairs bedroom where K.B. was assaulted.

¶ 91　　　Affirmed as modified;

¶ 92　　　cause remanded with directions.