2020 IL App (1st) 170229-U

THIRD DIVISION
May 6, 2020

No. 1-17-0229

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 83 CR 9326-01 |
| | ) | |
| JERRY MAHAFFEY, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Stanley J. Sacks, |
| | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court erred in denying defendant leave to file a successive postconviction petition where he has satisfied the cause and prejudice test based on new evidence to support his claim that his statement was the result of physical coercion by the arresting Chicago police officers.

¶ 2    Defendant Jerry Mahaffey appeals the trial court's denial of his motion for leave to file a successive postconviction petition, arguing that he has satisfied the cause and prejudice test because the admission of his physically coerced statement at trial violated his due process rights and his right to a fair trial.

¶ 3        In January 1985, defendant and his codefendant and brother Reginald Mahaffey[1], were

tried before a jury for the September 1983 murders of Jo Ellen and Dean Pueschel, the attempted

murder and aggravated battery of their son Richard Pueschel, and other multiple charges

including home invasion, rape, deviate sexual assault, armed robbery, residential burglary, and

theft. The details of the trial were thoroughly discussed by the Illinois Supreme Court in

defendant's direct appeal in *People v. Mahaffey*, 128 Ill. 2d 388 (1989) (*Mahaffey I*), and we

recite the facts adduced at trial only as necessary for the current issues before this court.

¶ 4        Prior to trial, defendant moved to suppress his statement based on his allegations of abuse

and threats from Chicago police officers. The trial court conducted a hearing in February and

March 1984. The supreme court summarized the evidence presented at the suppression hearing

as follows.

> "At the hearing on the motion, defendant and his wife, Carol Mahaffey, testified
>
> in favor of the motion. Their testimony was essentially as follows. On September
>
> 2, 1983, at approximately 5:40 a.m., defendant, his wife, and their two daughters
>
> were asleep in their apartment. A knock at the door awakened them. Carol opened
>
> the door, and Chicago police officers pushed their way into the apartment with
>
> their pistols drawn. Carol and the children were soon thereafter taken downstairs.
>
> During his arrest, police punched defendant in the face, causing his nose to
>
> bleed; threw him against a wall and put a gun to his head; kicked him in the groin,
>
> causing him to collapse and curl up in a ball; and, while he was incapacitated,
>
> kicked him twice in the ribs. The officers then tightened a plastic garbage bag
>
> over defendant's head until he could not breathe. Defendant's pajamas were

---

[1] Reginald Mahaffey is not a party to this appeal.

bloodied during the beating, so they were removed. Wearing different clothes, defendant was handcuffed and taken to Chicago police department Area 2 headquarters. In a squad car en route to Area 2, police threatened defendant with death.

At the station, defendant was threatened with death if he did not tell the officers what they wanted to know. No one informed defendant of his constitutional rights. After speaking with an assistant State's Attorney[(ASA)], at 1 p.m., defendant gave an inculpatory statement. It was subsequently typed; an [ASA] read only the first page of the statement to defendant. Having attained only the eighth grade, defendant signed the statement without reading it.

The State's case, consisting mostly of the testimony of Chicago police officers and assistant State's Attorneys, was essentially as follows. Detectives [Ronald] Boffo, [Charles] Grunhard, and [Francis] Gutrich, Sergeant [John] Byrne, and Officer [James] Lotito arrested defendant. Defendant was given *Miranda* warnings. They did not beat, kick, or otherwise abuse defendant. They allowed him to change his clothes prior to taking him to Area 2 Headquarters.

Detective [Frank] Kajari interviewed defendant at Area 2 headquarters. He initially gave defendant *Miranda* warnings. After reading each warning, Detective Kajari asked defendant whether he understood that warning. Defendant responded that he did. Defendant subsequently admitted his involvement in the crimes.

[ASAs] Irving Miller and George Velcich subsequently interviewed defendant, after giving him *Miranda* warnings, and took an inculpatory statement from him. The statement began with defendant again being given *Miranda*

3

warnings. After each warning, defendant again stated that he understood each. After the typed statement was shown to him, defendant stated that he could read English, but asked that the statement be read to him. Defendant initialed every page of the statement and signed it at the end.

A photograph of defendant taken on that day did not reveal any facial bruises, scars, or other signs of abuse. The next day, defendant was taken to Cermak Health Service. Emergency medical technician Muralles did not observe any signs of recent physical abuse." *People v. Mahaffey*, 165 Ill. 2d 445, 459-61 (1995) (*Mahaffey II*).

¶ 5    Following arguments from the parties, the trial court denied defendant's motion to suppress his statement and found that "the great weight of the evidence" indicated "there was no brutality" at the time of defendant's arrest and through his time at the police station. The court noted that "[a]ll of the police officers without exception have denied each and every one of the assertions" by defendant. The court found there was "overwhelming evidence" to refute defendant's assertions of abuse.

¶ 6    The evidence at trial included 11-year-old Richard Pueschel's identification of defendant as the perpetrator, defendant's confession, and the recovery of property taken from the Pueschel apartment found in defendant's apartment, as well as police testimony regarding the investigation. Sergeant John Byrne testified that defendant's brother Cedric Mahaffey told police that he knew who committed the murders and based on Cedric's information, defendant and his brother Reginald were arrested. Defendant's theory at trial was that "the police had beaten him and extracted a false confession from him. He contended that he had rehearsed his statement with the police and the [ASA] prior to the arrival of the court reporter." *Mahaffey I*, 128 Ill. 2d at 404.

Defendant also raised reasonable doubt as to his guilt. The jury found defendant guilty of the murders of Dean and JoEllen Pueschel, the attempted murder and aggravated battery of Richard Pueschel, home invasion, sexual assault, armed robbery, residential burglary, and theft. Defendant was subsequently sentenced to death on the murder convictions, but the sentence was commuted to life by former Governor George Ryan in 2003.

¶ 7     While defendant's direct appeal was pending, the United States Supreme Court issued its decision in *Batson v. Kentucky*, 476 U.S. 79 (1986), and in light of *Batson*, the Illinois Supreme Court issued supervisory orders in which it retained jurisdiction and directed the trial court to conduct a hearing to determine whether the jury selection at defendant's trial complied with *Batson*. The trial court found that defendant had failed to establish a *prima facie* case of discrimination in jury selection. In his direct appeal, defendant argued that: (1) the trial court erred in its finding that he failed to establish a *prima facie* case of discrimination under *Batson*; (2) the trial court erred excusing a potential juror for cause without inquiry into her thoughts on the death penalty; (3) the trial court erred in admitting Richard's in-court identification of defendant; (4) defendant was denied a fair trial by a comment made by JoEllen's mother from the gallery; (5) the prosecutor's remarks during trial and closing argument shifted the burden of proof and undermined the presumption of innocence; and (6) the State failed to prove the *corpus delicti* of the sexual assault. *Mahaffey I*, 128 Ill. 2d at 395-96. Defendant also raised multiple issues related to the sentencing phase of his trial and the imposition of the death penalty. Defendant's convictions and sentence were affirmed by the supreme court. *Id*. at 432-33.

¶ 8     In September 1992, defendant filed his amended postconviction petition raising 21 claims. In March 1993, the trial court granted the State's motion to dismiss the petition without an evidentiary hearing. On appeal, defendant argued that his constitutional rights were denied

because: (1) the State received twice the number of peremptory challenges that he received; (2) his trial counsel had a conflict of interest; (3) his trial counsel was ineffective at his suppression hearing, death penalty hearing, and on direct appeal; (4) the supreme court erred in holding that *People v. Gacho*, 122 Ill. 2d 221 (1988), applied prospectively only; and (5) the jury received inadequate instructions for the death penalty hearing. *Mahaffey II*, 165 Ill. 2d 445, 453 (1995). Specifically regarding the ineffective assistance claim, defendant contended that at his suppression hearing, his trial counsel failed to investigate and introduce evidence that (1) defendant was mentally disabled and incapable of understanding his *Miranda* warnings; (2) his neighbor heard police officers beat defendant during his arrest; and (3) the Chicago police officers stationed at Area 2 had a pattern and practice of using brutality in extracting inculpatory statements. *Id*. at 459.

¶ 9      Defendant attached an affidavit from his upstairs neighbor Charles Patterson to his postconviction petition. In the affidavit, Patterson stated that in September 1983, he lived in the apartment above defendant and his family. During the early morning hours of September 2, 1983, he was awakened by the sound of fighting from defendant's apartment. He heard "someone repeatedly being thrown against the walls and knocked to the floor" and "defendant screaming." He also heard a "strange man yelling 'Get up!' " According to Patterson, it was his "impression" from what he heard that defendant "was getting the 's*** beat out of him.' " He listened to the fighting for five minutes and went to his front door, he opened it and saw the building surrounded by police with guns drawn. Patterson was willing and available to testify, but he was never contacted by defendant's trial counsel or the prosecution.

¶ 10     The supreme court affirmed the dismissal of defendant's postconviction petition. *Id*. at 472. Regarding the ineffective assistance alleged at the suppression hearing, the reviewing court

6

found that while Patterson's affidavit corroborated the testimony of defendant and his wife, it "would not have created a reasonable probability that the trial court would have granted defendant's motion to suppress." *Id*. at 464. The court noted that "the trial court found by 'the great weight of the evidence' that defendant was not brutalized." *Id*. In response to defendant's assertion of the pattern and practice of Area 2 police officers, defendant included an affidavit from a worker at a citizen's watchdog group in which she stated that she has reviewed numerous complaints of police brutality at Area 2 between 1982 and 1984, and based on these complaints, she opined that Area 2 police engaged in a pattern and practice of brutality to extract inculpatory statements. The supreme court concluded that defendant's claim failed to show both deficient performance and prejudice because his attorney could not introduce evidence of the police brutality which "does not exist" and defendant was not prejudiced "because it would properly have been rejected as irrelevant to his particular case." *Id*. at 465.

¶ 11 Defendant also filed multiple cases in the federal courts. In November 1995, defendant filed his petition for federal *habeas corpus* relief with the United States District Court for the Northern District of Illinois, which the district court denied. *United States ex rel. Mahaffey v. Peters*, 978 F. Supp 762 (1997). Defendant appealed to the Seventh Circuit Court of Appeals, arguing that he had established a *prima facie* case of discrimination in jury selection. Initially, the Seventh Circuit affirmed the district court's dismissal of defendant's *habeas corpus* petition (*Mahaffey v. Page*, 151 F. 3d 671 (1998)), however on petition for rehearing, the Seventh Circuit reversed the district court and determined that the state circuit court never proceeded beyond the first stage at the 1987 *Batson* hearing, and defendant sufficiently set forth a *prima facie* case of discrimination in the State's use of peremptory challenges. *Mahaffey v. Page*, 162 F. 3d 481, 486 (1998). The Seventh Circuit remanded defendant's case to the state circuit court for a new

hearing on defendant's *Batson* claims. The circuit court subsequently conducted a *Batson* hearing and denied defendant relief. This court affirmed the circuit court's decision on appeal. *People v. Mahaffey*, No. 1-03-2409 (Aug. 1, 2005) (unpublished order under Supreme Court Rule 23). In 2006, defendant filed a motion to reinstate his *Batson* claim in his *habeas corpus* petition with the federal district court, which the court subsequently dismissed as untimely. Defendant then appealed to the Seventh Circuit where the dismissal was affirmed. *Mahaffey v. Ramos*, 588 F.3d 1142 (2009).

¶ 12     In June 2011, defendant filed a *pro se* claim with the Torture Inquiry and Relief Commission (TIRC). Defendant made the following allegations:

> "police punched defendant in face, causing nose to bleed; kicked him in head and ribs; put gun to head; tightened a plastic garbage bag over head until could not breathe; caused pajamas to be bloodied and so made defendant change clothes. All this happened at defendant's apartment. Threatened defendant with death [illegible]."

Defendant named Detectives Boffo, Grunhard, Gutrich, Sergeant Byrne, and Officer Lotito as the officers in involved in the torture.

¶ 13     In July 2013, the TIRC found by a preponderance of the evidence that there was sufficient evidence of torture to conclude that defendant's claim was credible and merited judicial review. The decision included TIRC records for the officers involved. The TIRC records indicated as follows: Sergeant Byrne had been accused of abuse and coercion in 21 cases, including 9 complaints of "bagging," where a plastic bag is tightened around a suspect's head to inhibit breathing; Detective Grunhard had been accused in 6 cases, including 5 complaints of

"bagging"; Detective Boffo had been accused in 7 cases, including 4 complaints of "bagging"; and Officer Lotito had been accused in 8 cases, including 4 complaints of "bagging."

¶ 14    The commission concluded that defendant has "consistently claimed" abuse and torture since he was taken to the Cook County Jail in the same manner alleged in his TIRC claim, his claim was "strikingly similar" to other claims of torture contained in the Chicago Police Department's Office of Professional Standards (OPS) reports, the accused officers were identified in other cases alleging torture, and defendant's claim was consistent with the OPS findings of systemic and methodical torture at Area 2 under Jon Burge. The commission found,

> "While it can be argued that some of the evidence has already been presented to the courts and found wanting, no court has ever viewed it from the present perspective aided by the *entirety* of the evidence set forth above. It should also be remembered that for years courts ignored the evidence of torture under Burge in cases such as Andrew Wilson, Darryl Cannon, and Aaron Patterson. Indeed, this reluctance to engage this fundamental issue is one of the reasons for the Commission's existence." (Emphasis in original.)

¶ 15    In 2014, the circuit court appointed David Yellen, dean of Loyola Law School, to investigate any inmate's claim that he was forced to confess by Burge or any officers under his command. Yellen referred defendant's case. In February 2015, the circuit court appointed private counsel to represent defendant in his postconviction claim. In December 2015, the arbitrator issued a decision on the contested claims, which included defendant, relating to the City of Chicago's ordinance providing for reparations for Burge torture victims. The arbitrator found defendant's claim to be credible. After detailing defendant's allegations, the arbitrator stated,

"We now know that Grunhard, Boffo, Lotito, and Byrne have been accused many times of abusive conduct similar to what Mahaffey alleges here."

¶ 16    In January 2016, the TIRC issued an amended disposition of defendant's claim, finding there was insufficient evidence of torture to merit judicial review. The commission did not find defendant to be a credible witness and did not find sufficient corroborating evidence of torture for the circuit court to review his claim. The TIRC listed the following evidence as "potentially corroborating" defendant's claim: (1) a postarrest photo that, "while not showing major injuries, appears to show a cut or scratch to his nose and possibly dried blood, as well as an apparent bruise to his left temple;" (2) a medical opinion that the photo is consistent with defendant's claim, but not conclusive; (3) medical records that show defendant's brother Terry, who was arrested the same night but never charged, was treated at Cook County Hospital for a beating within days of his release; (4) a statement from defendant's trial counsel that defendant told him the details of the beating at their first meeting shortly after defendant's arrest; and (5) testimony from two of defendant's siblings that they saw or heard evidence of police abuse. The commission also noted that there have been "a series of allegations against some of the detectives" who arrested defendant, "some of which have been accepted by courts. Two of these detectives have asserted the Fifth Amendment in response to questioning by Commission staff."

¶ 17    The TIRC listed the following evidence that was not indicative or countered defendant's claims of torture: (1) defendant's extensive criminal history, which weighed heavily against his credibility; (2) the September 1983 intake form from Cermak Hospital (the jail hospital) noted no bruises or cuts and that defendant stated he was in good health; and (3) Irv Miller, the ASA who took defendant's court-reported statement in 1983, voluntarily spoke with Commission staff and appeared before the Commission, told them he saw no signs of abuse or coercion on defendant,

nor did he see detectives engage in any coercive behavior. Also, prior to taking defendant's statement, Miller asked defendant how he had been treated by the police, and defendant did not report any abuse.

¶ 18    The disposition then recounts in detail the factual background of the case, including the crimes, defendant's trial court proceedings, and his various state and federal appeals.

¶ 19    The amended disposition explained the circumstances leading to the new decision.

> "After the press reported the referral, crime victims and family members began contacting state officials. The victims were understandably angered that they had not received prior notice of the TIRC proceedings, and objected to the 2013 referral of the Mahaffey case to the Circuit Court, claiming that it violated the TIRC Act.
>
> In response to the points raised by the family members, the Commission repeatedly apologized to the crime victims and their families. At TIRC's request, Jerry Mahaffey's claim was referred from the Circuit Court back to TIRC. The executive director of the Commission resigned and was replaced, and several new Commissioners were appointed by then-Governor Quinn. The new director promised to reinvestigate the claim. In addition, the Commission invited submissions from the family members."

¶ 20    TIRC received multiple submissions as well as oral and written submissions, from the victims' family members, which included: defendant's 22-page confession, stolen property recovered at defendant's apartment, defendant's extensive criminal record impeached his credibility, ASA Miller testified that defendant did not tell him of the abuse while defendant claimed he told the ASA of the abuse, Area 6 detectives were involved in the interrogation at the

police station in addition to Area 2 detectives, the photograph of defendant taken after the statement showed no sign of injury, and the jail intake record showed no injury and defendant's first complaint of abuse was three days later. At a subsequent presentation, the family members displayed several photographs but did not submit them as part of the presentation. The family presented three pathologists with defendant's lineup photo and all disagreed with the Commission's pathologist's opinion that the photograph was consistent with defendant's abuse claims, but the family did not submit the reports at that time though they offered to submit at a later time if needed. The family also noted that defendant's wife made no claims of seeing bruises on defendant in her testimony at the suppression hearing, nor did she allege any bruises or abuse of defendant in a television interview that was conducted shortly after the lineup.

¶ 21    TIRC staff reviewed the materials in the file, including the family's materials. The staff reviewed impounded evidence and photographs. The Commission found that the "photographic evidence does not show extensive damage." The Commission observed a scratch or cut on defendant's right nostril, a mark at the top of his moustache under that nostril, and a mark on the bottom of defendant's left nostril that was not clear; the marks could be dried blood. A closeup of defendant appeared to show a red mark on defendant's left temple. The Commission subpoenaed photographs from defendant's prior arrests and none of the photographs contained similar marks on defendant's nose. The executive director submitted the photos and medical records to an anatomic pathologist for an evaluation. "The pathologist concluded that the photos were consistent with [defendant's] claims that he was punched in the nose and thrown against the wall, though not conclusive of those claims." TIRC staff asked the pathologist "whether the marks could be the result of any sort of struggle in the course of committing the murders. The pathologist acknowledged that as a possibility, but thought it more likely that the cut on the nose

and possible dried blood were more recent, from the day of the arrest."

¶ 22    The Commission also interviewed defendant's trial counsel on multiple occasions. Trial counsel recounted that he met with defendant shortly after his arrest and defendant described the beating during the initial meeting. The Commission also deposed defendant's brother Cedric and Lorraine Mahaffey. Cedric stated that he heard defendant "being thrown around and shouting at the police station." Lorraine stated she was called by defendant's wife Carol at the time of the arrest. She saw defendant taken out of his apartment and there was blood on his face. She saw defendant's brother Terry after he was released from the police and he went to the hospital. Two other brothers of defendant also told Lorraine that they had been beaten by the police and were later released. She reviewed one of the photographs of defendant and noted that the cut and marks on defendant's face were not normally present before his arrest. The Commission also reviewed the records for Terry Mahaffey. He was arrested the same morning as defendant, but no criminal charges were brought against him. He was treated at Cook County Hospital a couple days later. He reported that he had been beaten up and felt dizzy with pain in his abdomen, arms, and legs, and that he had vomited blood. The exam notes found a red bruise on his sternum and blood in his stool.

¶ 23    The disposition detailed the statements given by ASA Miller in relation to his interview of defendant after the arrest. He stated that although the case was being investigated by Area 6 detectives, defendant was in custody at Area 2 and Jon Burge was among the officers present. He did not know that Sergeant Byrne had been near defendant and he had since learned that Sergeant Byrne was one of Burge's proteges. During every suspect interview, ASA Miller would meet privately with the suspect to make sure the suspect had not been mistreated and neither defendant nor his brother Reginald complained about mistreatment by the police. He did not

observe any physical injuries on defendant. ASA Miller admitted that he never had a suspect tell him during an interview that the suspect had been abused by police officers. ASA Miller detailed his practice of deliberately including a minor error in statements from witnesses. This mistake would then need to be corrected when he read the statement back with the witness and suspect, including defendant. This was "common practice" and the "policy was in place to buttress the circumstances under which the confession was taken and he [did] not view that practice as unethical." Defendant was lying if he testified that he told ASA Miller about being kicked, "bagged," and having a gun pointed at him. He noticed no physical discomfort by defendant or his brother. He had the court reporter take a Polaroid photograph of defendant at the conclusion of the statement. ASA Miller state that "nobody" liked Sergeant Byrne, "he's a gruff individual," but no one told Miller that "Byrne or anyone else mentally or physically coerced them; it didn't happen." He did not dispute that Burge and his men tortured some defendants, but he was "unaware of any [ASA] that reported suspected torture by Burge or his men to federal authorities."

¶ 24    The TIRC attempted to depose or interview police officers involved in defendant's arrest, but Sergeant Byrne and Detective Boffo asserted their Fifth Amendment rights. Detective Grunhard is now deceased. TIRC staff attempted to contact Detective Francis Gutrich who lives out-of-state, but was unable to reach him. There was no mention of Officer Lotito.

¶ 25    The Commission made several findings of fact and conclusions. Defendant has told a largely consistent story of being beaten and threatened. While the Commission was not charged with determining the guilt or innocence of persons who claim they were convicted through the use of tortured confessions, the Commission found that defendant's claim of innocence is not credible. Defendant was found to be a not credible witness, while the Commission found ASA

14

Miller to be "very credible." Defendant's brother Terry was likely beaten in police custody. Defendant and his brothers were taken into custody at around the same time.

¶ 26    The Commission listed potential evidence that defendant was struck in police custody. The postarrest photo showed a cut or scratch, possibly dried blood, and an apparent bruise to his left temple. The affidavit from Charles Patterson that he heard defendant crying out in his apartment. Testimony from defendant's wife Carol that was similar to Patterson's affidavit. Lorraine testified that she saw defendant leave the apartment bloodied. Defendant's trial counsel gave a statement that defendant described the beating at their first meeting. Two of the named officers took the Fifth Amendment when subpoenaed. The type of beating and "bagging" described by defendant is consistent with conduct identified in OPS reports.

¶ 27    The Commission then detailed evidence weighing against defendant's claim. ASA Miller's "very credible" testimony that neither defendant nor Reginald complained when he asked how they had each been treated. A "complete lack of *immediate* documentation of injury or torture" by defendant upon arrival at Cook County Jail. (Emphasis in original.) The documentation defendant relied on is from a medical examination several days after his arrival to jail. Defendant lacked credibility based on his long criminal history as well as his testimony that he was unfamiliar with *Miranda* rights. Carol's credibility about the abuse was undermined by her failure to mention any bruises, screaming, or alleged abuse on the night of arrest when she was interviewed by a reporter. Her suppression testimony did not mention bruises or marks on defendant's face, but only came out in her trial testimony. The Commission's pathologist acknowledged that the marks shown in defendant's booking photo are also potentially consistent with being inflicted during the commission of the murders.

¶ 28    The Commission concluded that "the evidence detracting from [defendant's] credibility,

15

the very high credibility of Irv Miller, and the complete absence of immediate documentation of injury at the Cook County Jail significantly undermine potential factors in his favor." The Commission found by a preponderance of the evidence that there was insufficient evidence of torture to merit judicial review.

¶ 29    Two commissioners dissented from the decision. They found that defendant's description of abuse and torture fit within the definition. They noted that while they took none of defendant's claims at face value, "much of what he said about his arrest and interrogation was corroborated." Corroboration is supplied by several sources, including evidence from Cedric, Lorraine, and Terry. The dissent also acknowledged the trial court's ruling at the suppression hearing.

> "Our review of the suppression ruling in this case suggests that the trial judge thought that everything that happened in the arrest and interrogation of the Mahaffey brothers was regular, and that there was no reason to disbelieve the police officers. There were several reasons —unknown to the trial judge — to disbelieve the police officers."

¶ 30    The dissent contended that the majority committed error in failing to give proper weight that two of the involved officers took the Fifth Amendment about whether defendant was beaten. They also asserted that the majority failed to give proper weight to the many allegations of torture against Sergeant Byrne, including his disbarment from the practice of law, and this information was not available to the trial court at the suppression hearing. The dissent further asserts that the majority "gave too much weight to the unannounced appearance" of ASA Miller. The dissent noted that ASA Miller's statement that no beating occurred in his presence was credible, but defendant never claimed to have been beaten at the police station and ASA Miller was not present at the time of the arrest. The dissent found the fact that defendant did not

complain and signed a statement he had not been coerced to be "meaningless." The dissent notes that ASA Miller acknowledged that he never had a suspect tell him that he had been abused by the police. The dissent also noted a procedural error in the manner in which the case was heard. "While victims of crime have a statutory right to speak at Commission proceedings on a claim of torture, other witnesses do not." The dissent pointed out that the Commission may hold an evidentiary hearing, but is not required to do so. The Commission heard testimony from ASA Miller and the family members without calling other occurrence witnesses, including Sergeant Byrne and Detective Boffo and defendant's family members. "If the Commission had heard all of the witnesses (or none); as it should have done, we believe a different result may well have been reached." The dissent found there was sufficient evidence of torture to merit judicial review.

¶ 31    In June 2016, defendant, through his assigned private counsel, filed a motion for leave to file a successive postconviction petition. Defendant attached numerous exhibits to his motion, including (1) his original motion to suppress; (2) the transcripts of his suppression hearing; (3) excerpts of his trial; (4) his TIRC claim; (5) the original TIRC disposition; (6) TIRC findings for the involved officers; (7) excerpts of the Special State's Attorney's Report (SSA Report) from 2006; (8) the arbitrator's credible finding for the reparations to Burge torture victims; (9) the amended TIRC disposition; and (10) relevant case authority. The motion argued that cause was established because the SSA Report on torture by police officers at Areas 2 and 3 and the TIRC findings did not exist at the time defendant filed his amended postconviction petition in 1992. Defendant asserted in his motion that the prejudice requirement was satisfied by the holding in *People v. Wrice*, 2012 IL 111860, ¶ 71, that the "use of a defendant's physically coerced confession as substantive evidence of his guilt is never harmless error." (Emphasis omitted.)

Defendant argued that he has consistently claimed to have been physically coerced to confess to the crimes by the arresting officers, and therefore, he has shown prejudice.

¶ 32    In December 2016, the trial court entered a written order denying defendant leave to file a successive postconviction petition. In its opinion, the court found that defendant had satisfied the cause requirement based on the 2006 SSA Report, but the TIRC disposition did not support defendant's claim. However, the court concluded that defendant had failed to establish the prejudice requirement. The court found that defendant did not present new evidence to disturb the finding of the TIRC in his case. The court also held that defendant failed to consistently claim he was tortured because the issue was not raised on direct appeal, and defendant has failed to show his allegations were strikingly similar to other claims of torture.

¶ 33    This appeal followed.

¶ 34    On appeal, defendant argues that the trial court erred when it denied him leave to file his successive postconviction petition because his well-pled allegations of physical coercion satisfied the cause and prejudice test. The Illinois Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1 to 122-8 (West 2012)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both.  725 ILCS 5/122-1(a) (West 2012); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998).  Postconviction relief is limited to constitutional deprivations that occurred at the original trial.  *Id.* at 380.  "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment.  Rather, it is a collateral attack on the judgment."  *People v. Evans*, 186 Ill. 2d 83, 89 (1999).

¶ 35    Only one postconviction proceeding is contemplated under the Act (*People v. Edwards*, 2012 IL 111711, ¶ 22) and a defendant seeking to file a successive postconviction petition must first obtain leave of court (*People v. Tidwell*, 236 Ill. 2d 150, 157 (2010)). The bar against successive postconviction proceedings should not be relaxed unless: (1) a defendant can establish "cause and prejudice" for the failure to raise the claim earlier; or (2) he can show actual innocence under the "fundamental miscarriage of justice" exception. *Edwards*, 2012 IL 111711, ¶¶ 22, 23; *People v. Smith,* 2014 IL 115946, ¶ 34. Defendant has alleged only the first basis in the instant appeal.

¶ 36    The cause and prejudice standard is higher than the normal first-stage "frivolous or patently without merit" standard applied to initial petitions. *Edwards,* 2012 IL 111711, ¶¶ 25-29; *Smith,* 2014 IL 115946, ¶ 34 ("the cause-and-prejudice test for a successive petition involves a higher standard than the first-stage frivolous or patently without merit standard that is set forth in section 122-2.1(a)(2) of the Act"). Under the cause and prejudice test, a defendant must establish both: (1) cause for his or her failure to raise the claim earlier; and (2) prejudice stemming from his or her failure to do so. *Edwards,* 2012 IL 111711, ¶ 22 (citing *People v. Pitsonbarger,* 205 Ill. 2d 444, 459 (2002)). "A defendant shows cause 'by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings.' " *People v. Wrice*, 2012 IL 111860, ¶ 48 (quoting 725 ILCS 5/122-1(f) (West 2014)). In other words, to establish "cause" a defendant must articulate why he could not have discovered the claim earlier through the exercise of due diligence. *People v. Wideman*, 2016 IL App (1st) 123092, ¶ 72. A defendant shows prejudice by demonstrating that the claim so infected the trial that the resulting conviction or sentence violated due process. *Wrice*, 2012 IL 111860, ¶ 48.

¶ 37     Initially, we address the State's procedural arguments that defendant failed to properly file his motion for leave to file a successive postconviction petition by including a separate petition and a verification affidavit. According to the State, these mistakes warrant a summary dismissal. We disagree.

¶ 38     Section 122-1(b) does require a postconviction proceeding to be commenced with a petition "verified by affidavit." 725 ILCS 5/122-1(b) (West 2014). While a verification affidavit was not included, we do not find its absence to be preclusive. It is the defendant's burden to obtain leave before further proceedings on his claims may follow. *Edwards*, 2012 IL 111711, ¶ 24 (citing *Tidwell*, 236 Ill. 2d at 157). "To do so, we specifically acknowledged that 'it is incumbent upon [a petitioner], by whatever means, to prompt the circuit court to consider whether "leave" should be granted, and obtain a ruling on that question.' " *Id*. (quoting *Tidwell*, 236 Ill. 2d at 157). "Defendant not only has the burden to obtain leave of court, but also 'must submit enough in the way of documentation to allow a circuit court to make that determination.' " *Id*. (quoting *Tidwell*, 236 Ill. 2d at 161). "[S]atisfying the section 122-1(f) cause and prejudice requirement does not entitle the defendant to relief but rather 'only gives a petitioner an avenue for filing a successive postconviction petition.' " *People v. Bailey*, 2017 IL 121450, ¶ 25 (quoting *People v. Smith*, 2014 IL 115946, ¶ 29). "Further proceedings on successive postconviction petitions were clearly contemplated by the legislature." *Id*. The supreme court has permitted the consideration of a "hybrid motion and successive petition." *People v. Conick*, 232 Ill. 2d 132, 140 n. 2. The supreme court in *Tidwell* acknowledged this finding:

> "we characterized the document 'filed' by defendant as a 'hybrid motion and successive petition' and observed, in a footnote, 'while we agree that the filing of

a separate motion for leave to file a successive petition is preferred, we find that any technical imperfection in procedure in this case did not hinder the trial court from performing its review under either section 122-1(f) of the Act or section 22-105 of the Code.' " *Tidwell*, 236 Ill. 2d at 159-160 (quoting *Conick*, 232 Ill. 2d at 140 n. 2).

¶ 39    Similarly, we find the lack of a separate petition does not hinder our review. In this case, defendant's motion for leave to file a successive postconviction was 18 pages long and fully argued the requirements of the cause and prejudice test. Additionally, defendant attached over 1,100 pages and 16 exhibits in support. We conclude that defendant has submitted sufficient documentation to allow judicial determination as to whether he satisfied the cause and prejudice test and we decline to dismiss his appeal on this technical flaw.

¶ 40    We turn back to the merits of defendant's appeal. Defendant contends here that he has satisfied the cause requirement with six objective factors that impeded his ability to raise this claim in his initial postconviction petition: (1) the 2006 SSA report; (2) the 2013 TIRC original disposition; (3) the 2016 TIRC amended disposition; (4) TIRC database entries for the officers showing similar allegations in other cases; (5) the 2015 reparations finding; and (6) the 2012 decision in *People v. Wrice*, 2012 IL 111860. The trial court rejected defendant's claim that the TIRC dispositions supported the cause prong because the Commission ruled against him in the amended disposition. Defendant asserts that the TIRC dispositions help to establish cause because the dispositions contain considerable evidence that was not available previously, including Sergeant Byrne and Detective Boffo asserting their fifth amendment privilege as well as the medical records, photographs of defendant, and the report of an anatomic pathologist that the marks on defendant were consistent, though not conclusive, with the beatings he described.

Defendant also argues that cause was supported by the TIRC database listing the allegations against each of the involved officers and the similar claims of abuse, such as "bagging," being kicked in the groin, and smashed into a wall.

¶ 41    In response, the State contends that defendant cannot establish cause because he knew of the 2006 SSA Report ten years before he filed his successive postconviction petition, but instead of pursuing postconviction relief, defendant filed his claim before the TIRC. The State cites *People v. English*, 2014 IL App (1st) 102732-B, for support. However, *English* is inapplicable to the instant case. In that case, the defendant sought leave to file a successive postconviction petition based on newly discovered evidence of actual innocence, which is not subject to the cause and prejudice test. *Id*. ¶ 45. When applying the cause prong of the test, the defendant needs to show an objective factor that impeded his or her ability to raise the claim in an initial postconviction petition. See 725 ILCS 5/122-1(f) (West 2014). There is no requirement in the Post-Conviction Act that the claim must be filed within a certain time of discovering the objective factor. Moreover, the TIRC Act specifically provides that: "A claim of torture asserted through the Commission shall not adversely affect the convicted person's rights to other postconviction relief." 775 ILCS 40/55(b) (West 2016).

¶ 42    In *People v. Weathers*, 2015 IL App (1st) 133264, ¶ 36, this court held that the defendant satisfied the cause prong because he attached the TIRC report showing database entries for the police officers involved in his case with allegations similar to those alleged by the defendant and it was uncontested that the report was issued after the defendant's initial postconviction petition had been fully litigated. We reach the same result here. Defendant attached numerous documents to his motion for leave to file a successive postconviction, none of which existed at the time defendant filed his initial postconviction petition in 1992. Thus, because these documents were

not available at the time of defendant's initial postconviction petition, he has established the requisite cause, in that an objective factor impeded his ability to raise this claim at an earlier time.

¶ 43     Defendant asserts that he has established the prejudice requirement based on his well-pled and longstanding allegation that his statement was the result of physical coercion by police officers at the time of his arrest. As noted earlier, the Illinois Supreme Court has held that the "use of a defendant's *physically* coerced confession as substantive evidence of his guilt is never harmless error." (Emphasis in original.) *Wrice*, 2012 IL 111860, ¶ 71. At this stage of the proceedings, we must accept all well-pled facts as true.  See *Pitsonbarger*, 205 Ill. 2d at 467.

¶ 44     In *People v. Patterson*, 193 Ill. 2d 93, 145 (2000), the supreme court held that a defendant has presented sufficient evidence at the pleading stage to warrant further postconviction proceedings where: (1) the defendant consistently claimed he was tortured, (2) his claims of torture were and always had been "strikingly similar to other claims" depicted in the new evidence, (3) the officers identified in the evidence were the same officers in the defendant's case, and (4) the defendant's allegations were consistent with documented findings of torture against the officers. The trial court considered these factors and found that defendant has not consistently claimed he was tortured because the issue was not raised on direct appeal and that his claims of torture were not strikingly similar to other claims against the officers.

¶ 45     While it is correct that defendant did not challenge the denial of his motion to suppress on direct appeal, defendant, otherwise, has consistently asserted claims of physical coercion by the arresting officers. His trial counsel stated before the TIRC that defendant told him of the alleged abuse in their first meeting shortly after defendant's arrest, which prompted the motion to suppress. Defendant raised the issue in his initial postconviction petition in 1992 (*Mahaffey II*,

165 Ill. 2d at 463-64), and also in his federal *habeas corpus* petition in 1997 and the subsequent appeal (*Mahaffey v. Page*, 151 F.3d 671, 682-83 (1998)). Defendant also filed a claim with TIRC in 2011 and pursued reparations from the City. We do not believe the failure to raise the issue on direct appeal negates defendant's consistent claims that arose immediately following his arrest. Defendant has maintained this claim of the alleged physical abuse for over 30 years.

¶ 46    As to the second factor, defendant has asserted that he was punched, kicked in the groin and ribs, threatened with a gun pressed to his head, his head struck into a wall, and had a plastic bag tightened over his head to cause difficulty in breathing, known as "bagging." The State argues that his claims are not strikingly similar to those of other suspects because "this is an Area 6 case, not an Area 2 case, and his allegations of coercion show that he was not physically abused at Area 2." This argument is misplaced because it is uncontested that defendant was arrested by multiple Area 2 officers and he alleges that the abuse took place at his home during his arrest. The State offers no discussion relating to the Area 2 officers, but instead focuses on an Area 6 detective, on whom defendant has raised no claims of abuse. The TIRC database attached to defendant's motion shows that defendant's claims of abuse are indeed "strikingly similar" to other claims. As the original TIRC disposition observed, all four officers involved in the arrest had several abuse allegations against them, including multiple instances of "bagging." The TIRC database also shows multiple allegations of suspects having been kicked in the groin, threatened with a gun, and their heads "smashed" into a wall.

¶ 47    The third and fourth factors were clearly satisfied as all four officers were identified in other claims of torture under Burge at Area 2 and defendant's allegations are consistent with OPS findings of systemic torture by Area 2 officers.

¶ 48    The State also contends that the proceedings before the TIRC allowed defendant a full

hearing and the amended disposition rejected his claims. The State further observes that the trial court denied defendant's motion based in part on the TIRC amended disposition. However, the TIRC proceedings are not preclusive to claims made in the courts. See 775 ILCS 40/55(b) (West 2016) ("A claim of torture asserted through the Commission shall not adversely affect the convicted person's rights to other postconviction relief"). The reviewing court in *People v. Christian*, 2016 IL App (1st) 140030, considered the preclusive effect of TIRC dispositions. The court described the Commission's disposition as "simply finding that there is sufficient evidence to proceed to the next step, namely, a hearing before the circuit court. The Commission is not asked to make a final determination as to whether a claimant in fact proved that he was tortured." *Id.* ¶ 79. The *Christian* court further rejected an argument that a TIRC disposition raised collateral estoppel concerns, noting that a TIRC decision "is not the type of adjudicatory, judicial, or quasi-judicial decision to which collateral estoppel applies." *Id.* ¶ 84.

> "Examining the procedures set forth by the [TIRC] Act and its regulations, we cannot find that the [TIRC] Act sets forth a judicial proceeding for purposes of collateral estoppel. The [TIRC] Act does not describe an adversarial proceeding but describes an investigation conducted by the Commission after the claimant has filed a claim of torture. While the [TIRC] Act provides that the claimant is entitled to an attorney prior to signing a waiver of his or her procedural rights and "throughout the formal inquiry" if such a formal inquiry is granted, the [TIRC] Act does not provide either the claimant or the State any other rights. A hearing on the claimant's torture claim is purely discretionary, and the Commission may refer a claim to the circuit court without such a hearing." *Id.* ¶ 88.

¶ 49    The court further observed that the Commission was not part of the State's Attorney's

25

office and does not act on behalf of either party in its investigation. *Id*. ¶ 100. Similarly, the *Christian* court held that the law of the case doctrine was also inapplicable to TIRC dispositions. *Id*. ¶ 104.

¶ 50 Accordingly, this court is not bound by the TIRC disposition in order to consider whether defendant has established prejudice. Additionally, we note that the dissent in the TIRC amended disposition specifically pointed out that the Commission did not conduct a full evidentiary hearing, and thus, we find that fact further supports the nonpreclusive effect of the TIRC disposition.

¶ 51 We conclude that defendant has satisfied the prejudice prong of the test. Defendant's successive postconviction petition contains facts alleging that he was physically abused prior to giving his confession, and at this stage, we must accept those facts as true. Defendant's confession was introduced as substantive evidence at trial, and defendant has set forth claims that this confession was the result of physical coercion, including being kicked in the groin and ribs, threatened with a gun to his head, his head struck into a wall, and "bagged." Defendant has consistently raised these allegations which are strikingly similar to other claims and involved officers known to have participated in the systemic abuse at Area 2. Thus, defendant has satisfied the prejudice requirement such that his allegations of a physically coerced confession should proceed to the next stage of proceedings.

¶ 52 The remaining evidence at trial has no bearing on our consideration of the prejudice requirement. Since the use of a physically coerced confession cannot support harmless error, we do not consider whether the evidence at defendant's trial overwhelmingly supported his guilt such that it was unlikely the outcome of the proceedings would have been different had his physically coerced confession been suppressed. See *Wrice*, 2012 IL 111860, ¶ 84. Defendant still

must establish the allegations as he has set forth. "Satisfaction of the test merely allows the petition to proceed; it does not relieve the defendant of his evidentiary burden in the postconviction proceeding." *Id.* ¶ 85. Accordingly, we reverse the trial court's denial of leave to file a successive postconviction petition and remand for second stage proceedings and the appointment of counsel.

¶ 53    Based on the foregoing reasons, we reverse the decision of the circuit court of Cook County and remand for further proceedings consistent with this decision.

¶ 54    Reversed and remanded.