**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 200001-U

Order filed April 29, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0001 Circuit No. 01-CF-583 |
| PAYSUN S. LONG, | ) ) ) | Honorable Paul P. Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE PETERSON delivered the judgment of the court.
Justice Albrecht concurred in the judgment.
Presiding Justice McDade specially concurred.

_____

**ORDER**

¶ 1    *Held*:  The circuit court did not err in denying defendant's motion for leave to file a successive postconviction petition.

¶ 2    Defendant, Paysun S. Long, appeals from the Peoria County circuit court's denial of his motion for leave to file a successive postconviction petition. Defendant argues that his motion demonstrated both cause and prejudice. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          Defendant was charged with first degree murder (720 ILCS 5/9-1(a)(2) (West 2000)), stemming from a shooting on June 11, 2001. Defendant was 20 years old at the time of the offense. Following a jury trial, defendant was found guilty of first degree murder. At the sentencing hearing, a presentence investigation report (PSI) was presented which indicated defendant was first charged in criminal court at the age of 17. Defendant "was a special education student until the fifth grade and was retained three years." He had behavioral issues in middle school. Defendant began using marijuana at 14 years old, alcohol at 16 years old, and cocaine at 17 years old. He used marijuana and alcohol every day prior to his incarceration. Defendant's use of alcohol had increased over the two-year period leading up to his incarceration. He was ordered to undergo drug and alcohol treatment at the age of 17. The court considered factors in aggravation and found there to be no formal or informal factors in mitigation. The court considered defendant's youth in light of his criminal background, noting that "the defendant, unfortunately, in his young life, [had] violated the law in the past." The court sentenced defendant to 51 years' imprisonment.

¶ 5          On appeal, we reversed defendant's conviction due to prosecutorial misconduct during closing arguments and remanded for a new trial. *People v. Long*, No. 3-02-0132 (2003) (unpublished order under Illinois Supreme Court Rule 23).

¶ 6          On retrial, defendant was again found guilty by a jury of first degree murder. At the second sentencing hearing, additional evidence was presented in the updated PSI. Defendant obtained a general education diploma while in jail and family and social history was provided by defendant's mother. She indicated that several of defendant's friends were positive influences, while others were negative. The court again found no factors in mitigation and sentenced defendant to 51 years'

2

imprisonment. We affirmed defendant's conviction. *People v. Long*, No. 3-04-0381 (2006) (unpublished order under Illinois Supreme Court Rule 23).

¶ 7 In April 2007, defendant filed a postconviction petition (725 ILCS 5/122-1 *et seq.* (West 2006)). In the petition, defendant claimed appellate counsel in the direct appeal of his second trial was ineffective for failing to raise certain issues. The petition was dismissed at the second stage of proceedings. On appeal, we affirmed the dismissal. *People v. Long*, No. 3-08-0261 (2011) (unpublished order under Illinois Supreme Court Rule 23).

¶ 8 On September 13, 2019, defendant filed a motion for leave to file a successive postconviction petition, arguing that his 51-year sentence, a *de facto* life sentence, was unconstitutional under the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution. See *Miller v. Alabama*, 567 U.S. 460 (2012); *People v. Buffer*, 2019 IL 122327.Defendant alleged cause for not raising this claim in his initial petition, asserting that the basis of his successive petition was predicated upon changes in science and case law which developed after he filed his initial petition, citing *People v. House*, 2019 IL App (1st) 110580-B. Defendant attached two articles discussing new studies involving the brain development of young adults aged 18 to 21. Defendant alleged prejudice, arguing that the court failed to consider defendant's youth and its attendant characteristics in mitigation before sentencing him to a *de facto* life sentence. Regarding the eighth amendment, defendant contended that his sentence was unconstitutional because he was under the age of 21 when he was charged with first degree murder and was sentenced to 51 years' imprisonment in violation of *Miller* and *House*.

¶ 9 Regarding the proportionate penalties clause of the Illinois Constitution, defendant contended that his sentence was unconstitutional as applied to him where the court failed to

3

consider his rehabilitative potential. Specifically, defendant exhibited rehabilitative efforts while incarcerated as he held various jobs from 2009 to 2017 while in prison. Additionally, he actively sought additional employment and certificate opportunities; however, those opportunities were being provided to inmates with lesser sentences. Further, defendant contends that the court failed to adequately consider his life expectancy or the effects of peer pressure where defendant was raised by a single parent who worked two jobs which frequently left him alone in an area surrounded by gangs, murderers, drug dealers, and prostitutes. The court denied defendant's motion for leave. Defendant appeals.

¶ 10                                         II. ANALYSIS

¶ 11        Defendant argues that the court erred in denying him leave to file a successive postconviction petition where he sufficiently alleged both cause and prejudice. He argues that cause was established where he was unable to raise his proportionate penalties claim prior to his initial postconviction petition in 2007 because law applying *Miller* to young adults with *de facto* life sentences did not exist at that time. Further, defendant argues that he demonstrated prejudice where there was no indication on the record that the court considered his youth and its attendant circumstances in mitigation at sentencing and, in fact, affirmatively considered defendant's youth in aggravation.

¶ 12        The Post-Conviction Hearing Act (Act) contemplates the filing of a single postconviction petition. 725 ILCS 5/122-1(f) (West 2018). A petitioner must obtain leave of court when he seeks to file a successive postconviction proceeding. *Id.* Leave of court may be granted only if defendant demonstrates cause for his failure to bring the claim in his initial postconviction proceeding and prejudice resulting therefrom. *Id.* Both elements must be shown to obtain leave to file. *People v. Pitsonbarger*, 205 Ill. 2d 444, 464 (2002). A showing of cause requires the identification of an

4

objective factor that impeded the petitioner's ability to raise a specific claim during the initial postconviction proceedings. *People v. Wrice*, 2012 IL 111860, ¶ 48. " '[A] showing that the factual or legal basis for a claim was not reasonably available *** would constitute cause under this standard.' " *Pitsonbarger*, 205 Ill. 2d at 460 (quoting *Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999)). A showing of prejudice requires a demonstration that the claim, which was not raised during the initial postconviction proceedings, so infected the trial that the resulting conviction or sentence violated due process. *Wrice*, 2012 IL 111860, ¶ 48.

¶ 13        The cause and prejudice test for successive postconviction petitions involves a higher standard than that required at the first stage of postconviction proceedings. *People v. Smith*, 2014 IL 115946, ¶ 35. The petitioner need not present definitive proof of cause and prejudice but must adequately allege facts demonstrating both. *Id.* ¶ 34. "If a defendant fails to adequately allege cause and prejudice, the circuit court does not reach the merits of his successive petition because the cause and prejudice test is a procedural prerequisite to obtaining that review." *People v. Handy*, 2019 IL App (1st) 170213, ¶ 29.

¶ 14        Regarding defendant's eighth amendment claim, prejudice cannot be established as he was 20 years old when the offense occurred, and eighth amendment claims apply only to those individuals who were under 18 at the time of the offense. See *People v. Harris*, 2018 IL 121932, ¶ 61.

¶ 15        Regarding defendant's proportionate penalties claim, we begin with the cause requirement since it is dispositive. Defendant argues that he has demonstrated cause as he was relying on case law that was unavailable to him at the time of his initial postconviction petition. Defendant reiterates our finding of cause in *People v. Bland*, 2020 IL App (3d) 170705, ¶ 10, highlighting that "the suggestion that *Miller* could be applied to those 18 years of age and older was not made

5

until 2015 in *People v. Thompson*, 2015 IL 118151, and *Miller* was not extended to *de facto* life sentences until 2016 in *People v. Reyes*, 2016 IL 119271." Defendant further points to our supreme court's decisions in *People v. House*, 2021 IL 125124, ¶ 31 and *Harris*, 2018 IL 121932, ¶¶ 45-46, to support his argument that the reasoning of *Miller*, 567 U.S. 460 and its progeny has been expanded to apply to emerging adults, like defendant, under the Illinois Constitution.

¶ 16        Illinois has historically held there to be "a marked distinction between persons of mature age and those who are minors" because "the habits and characters of the latter are presumably, to a large extent, as yet unformed and unsettled." *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 423 (1894) (affirming a statute that authorized sentencing for 10- to 21-year-old offenders to the reformatory as opposed to the penitentiary). In 1899, Illinois created the first juvenile court system in the nation. *Application of Gault*, 387 U.S. 1, 14 (1967), *abrogated on other grounds by Allen v. Illinois*, 478 U.S. 364 (1986). The Juvenile Court Act of 1899 provided that males aged 16 and under and females aged 17 and under be subject to juvenile proceedings as opposed to criminal court. *People v. Day*, 321 Ill. 552, 555-57 (1926). This gender inequity was found to be unconstitutional in the 1970s and the legislature changed the applicable section to any *minor* under the age of 17. See *People v. Ellis*, 57 Ill. 2d 127, 132-33 (1974).

¶ 17        In recent years, advances in scientific research into the brain development of juveniles and young adults have led to an expansion of protections for both juvenile offenders and young adults up to the age of 21. This began on a federal level with *Miller* in 2012 and its progeny and continued on a state level. In 2014, the Illinois legislature raised the age of juvenile court jurisdiction to include all 17-year-old offenders. 705 ILCS 405/5-120 (West 2014). In 2016, Public Act 99-258 enacted a new statute, codifying the additional mitigating factors of youth and its attendant circumstances which must be considered by a sentencing court for those under 18 at the time of

the offense. Pub. Act 99-258, § 15 (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-4.5-105). In 2019, another statute was passed which provided new opportunities for parole for youthful offenders who were under the age of 21 at the time of the offense. Pub. Act 100-1182, § 5 (eff. June 1, 2019) (adding 730 ILCS 5/5-4.5-115).

¶ 18    The legal response to our evolving scientific understanding is not limited to statutory changes. Our case law has expanded protections for young offenders as well. *Miller* has been found to apply retroactively to cases on collateral review and has been extended to discretionary *de facto* life sentences. See *People v. Davis*, 2014 IL 115595, ¶ 42; *People v. Holman*, 2017 IL 120655, ¶ 40. In *Buffer*, the court held a sentence over 40 years' imprisonment for a juvenile constituted a *de facto* life sentence. *Buffer*, 2019 IL 122327, ¶¶ 27, 40-41. With its decisions in *Thompson* and *Harris*,

> "our supreme court *** opened the door for young adult offenders to demonstrate that their own specific characteristics at the time of their offense were so like those of a juvenile that the imposition of a life sentence, absent the safeguards established in *Miller*, violates the proportionate penalties clause of the Illinois Constitution." *People v. Evans*, 2021 IL App (1st) 172809, ¶ 16.

¶ 19    While 128 years ago the law recognized a distinction between minors that were 10 to 21 years old and offenders of a mature age, such recognition eroded with time. For years before defendant's birth in 1980 through 2007 when he filed his initial postconviction petition, juvenile protections only applied to those who were 16 years old or younger. Defendant's first criminal court charges occurred when he was 17 years old. This court has agreed with defendant's argument that the legal basis for his claim that juvenile protections should be extended to him as a young adult, was not reasonably available to him in 2007. Historically, we have found that pleading facts

7

similar to those in the case at bar was sufficient to satisfy the cause and prejudice test for leave to file a successive postconviction petition. *People v. Bland*, 2020 IL App (3d) 170705.

¶ 20 However, since the filing of the briefs in this case, our prior judgment in *Bland* has been vacated by the supreme court based on *People v. Moore*, 2023 IL 126461, and the circuit court's denial of leave to file in that case was affirmed. *People v. Bland*, No. 3-17-0705 (2023) (unpublished summary order under Illinois Supreme Court Rule 23(c)). In *Moore*, our supreme court stated that *Miller* and its progeny do not provide cause for a young adult to raise a claim under the eighth amendment or proportionate penalties clause of the Illinois Constitution. *Moore*, 2023 IL 126461, ¶¶ 38, 42. Accordingly, defendant's reliance on changes in the law, namely the prior unavailability of *Miller* and its progeny, do not provide the necessary cause for leave to file a successive postconviction petition. Since we hold that defendant failed to satisfy the cause requirement, we need not address the prejudice requirement. See *Pitsonbarger*, 205 Ill. 2d at 464 (both cause and prejudice "must be met in order for the petitioner to prevail"). The circuit court did not err in denying defendant's motion for leave to file a successive postconviction petition.

¶ 21 III. CONCLUSION

¶ 22 The judgment of the circuit court of Peoria County is affirmed.

¶ 23 Affirmed.

¶ 24 PRESIDING JUSTICE McDADE, specially concurring:

¶ 25 I write separately in this case not because the majority decision on this specific claim is legally wrong. It is not. As shown in the order, the case law, as it currently stands, compels that decision. I agree with the majority's sensitivity to the potential impact of *Miller v. Alabama* on the treatment of young offenders and share what seems to me to be some frustration with the limitation on access to that potential. Under *Miller*, factors that had previously been viewed as aggravating

8

can now be seen as jumping-off points for possible rehabilitation. It seems clear that the trial judge in this case did not see or consider that possibility and in the wake of *Miller,* a judge, informed by emerging science, might have. But the majority is correct that *Moore* firmly slams the door on that consideration for this defendant and that the denial of leave for him to file a successive postconviction petition under the proportionate penalties clause must be affirmed.

¶ 26      I find myself in the relatively unique position of having sat on multiple panels in Long's appeals over the past 20 years and have a more broadly based perspective than we usually have as reviewing judges. It is from that fuller context that I write separately here. I do so to make two points. First, in a riff on the "fruit of the poisonous tree" analysis, I submit that Paysun Long has never had a fair trial, and all of the subsequent activity in his case, including this most recent petition, stems from and is built upon a rotten core. My second point argues that in our zeal to preserve the validity of the jury verdict, we employ a standard of review that subordinates a meaningful review to relatively uncritical affirmance of the conviction. By contrast, in post-conviction proceedings, we do not hesitate to utilize every technicality and split every hair to preserve the sanctity of that verdict even though the trial in which it was reached may not have fully comported with due process.

¶ 27      Long has served roughly 20 years of a 51-year sentence in the Department of Corrections. I do not suggest that he was innocent of the murder of Larriec ("Larry") Sherman, only that it is my belief that he has never had the question of his guilt or innocence tested in a fair and proper criminal proceeding; that he has never been proven guilty beyond a reasonable doubt. I sat on the direct appeals of both of his trials. His initial conviction was reversed based on prosecutorial misconduct because of numerous prejudicial and racially charged errors and the case was remanded for a new trial. In an astonishing display of chutzpah, the prosecution repeated the same

9

errors in the second trial that had led to reversal of the initial conviction and clearly documented perjury was layered on. This time the appeal was heard by a different panel, the majority of whom decided that what had once been clearly wrong had somehow become right and that second conviction was affirmed.

¶ 28    In both of the trial appeals, this court acknowledged the absence of any direct physical or forensic evidence linking Long to the murder in Taft Homes. The only objective evidence the State had was that Sherman had been shot four times in the back by bullets traveling on a north/south trajectory. Both panels characterized the evidence generally as "not overwhelming." The jury's determination of guilt or innocence was thus wholly dependent on its assessment of the credibility of the oral testimony of four women produced by the State as eyewitnesses. Each of the witnesses contradicted either herself, one of the other witnesses, or both, casting doubt on critical points throughout the investigation and during both trials. During the second trial, one of the witnesses lied directly to the jury while testifying. This lack of competent and reliable evidence posed a challenge to the prosecution which it navigated in several ways, mostly in closing argument.

¶ 29    Lamenting the dearth of evidence in the case, the State made it clear that fault did not rest with it, recasting the bystanders gathered at the scene when the police arrived as obstructive witnesses and quoting the slave woman in "Gone with the Wind":

> "Officer Wetzel told you when he got there there were 40 to 60 people around Mr. Sherman. And sorry, Miss Scarlet, but we don't know nothing about birthing no babies, we just don't [know] nothing. 40-60 people standing around that night…So, on the night of June 11, 2001, although there are 40 to 60 people around this dead young man or dying young man, nobody knew nothing, nobody came forward, nobody knows nothing."

10

This had the additional benefit of reminding the jurors that everyone involved in this case was black.

¶ 30       In discussing the eyewitness testimony and cherry-picking which evidence the jury should and should not believe, the State urged the jury to decide that two witnesses had lied under oath— had committed perjury—at trial but that their inconsistent videotaped statements should be believed. By contrast, they should believe only the trial testimony of the witness known to everyone, except the jurors, to have lied on the stand, and not her earlier statement to the State's investigator recanting her testimony.

¶ 31       The prosecution summed up the witnesses it had been saddled with, saying "[t]hese people ought to stick to the truth because they really can't get their lies together, because it was the truth that was consistent. It was the truth that came out. It was the truth that Paysun Long fired the shots that killed Larry Sherman."

¶ 32       The final point I will make here is that the State trivialized the importance of truth and the seriousness of perjury in the trial and annexed the jurors to itself as follows:

> "I will have to start this off by saying according to the [defense counsel] principle of law, you can't believe a thing I am about to tell you because I have to stand here and tell you at the outset that I [ ] have previously told a lie. You talk to my parents. I have told some doozies. *** I would submit if we looked around this room and if we had to inquire of everybody in the room, I wonder if we could say those of you who have never told a lie under any circumstance, some serious, some not serious, stand up; and I would submit to you there ain't anybody out there who is going to be able to do that."

11

That argument, of course, ignores the fact that the witness lied to the jury after taking a solemn oath to tell them the truth. The prosecutor did not contend that she or all the other presumed liars in the courtroom and on the jury deviated from the truth while under oath. Nor did she ever confirm for the jury that that witness had lied to them in the courtroom, under oath, and that the State knew she had lied. To secure a conviction, the State advanced the general incredibility of its witnesses while refusing to acknowledge the specific perjury of one of them and asserting the unconfirmed perjury of another, and then helped the jurors cherry-pick the evidence by telling them what parts of their witnesses' stories were true and what should be rejected. Long's conviction was affirmed and his petition for leave to appeal was rejected by the supreme court.

¶ 33     I also sat on Long's appeal from the second stage denial of his initial postconviction petition and that unconfirmed perjury loomed large as its subject. In that case he alleged the ineffectiveness of his appellate counsel for failing to raise the issue that the State denied him a fair second trial by failing to correct testimony it knew to be false, thereby violating his constitutional right to due process. We found that one of the State's witnesses had committed perjury in her testimony directly to that jury during trial, that the State was aware that perjury had indeed occurred in the second trial, and that the State had failed to bring it to the attention of the jury or to acknowledge its occurrence when defense counsel questioned her about it. The majority on our panel acknowledged the due process violation and decried the prosecution's "dereliction of duty" and its "improper and regrettable" conduct but found the State's failure to confirm or correct the lie of its witness to be "harmless" because the false evidence had been "impeached" by defense counsel and thus "corrected" at trial. This was the ruling even though, in the absence of confirmation by the State, the jurors remained free to assess whether to believe the investigator.

12

The dismissal of Long's postconviction petition was affirmed and his petition for leave to appeal was again denied by the supreme court.

¶ 34    But Long did not limit his search for a new trial to the State courts. In 2011, he petitioned for a federal writ of *habeas corpus*, alleging several claimed errors in his second trial, including the State's failure to confirm or correct the perjury of its witness. *Long v. Rednour*, 2013 WL 12312785 at 1-2 (C.D. Ill. 2013). The district court denied the petition (*id.* at 7), but Long fared better, at least initially, in his appeal to the Seventh Circuit. *Long v. Butler*, 809 F. 3d 299 (7th Cir. 2015). There, a three-judge panel, while finding several of his claims of error had been procedurally defaulted (*id.* at 313-16), found the issue of perjury was still viable and analyzed it (*id.* at 308-13).

¶ 35    For his claim to be heard, Long had to surmount a series of legal hurdles. He was required to show that the decision of which he complained was contrary to clearly established federal law as determined by the United States Supreme Court or resulted from an unreasonable determination of facts in light of the evidence. *Id.* at 310. He was also required to show that his constitutional claim had been "fairly presented" to the State court through one complete round of review, either on direct appeal or three post-conviction proceedings. *Id.* at 307.

¶ 36    The "clearly established federal law" on which both Long and the federal panel primarily relied was *Napue v. Illinois*, 360 U.S. 264 (1959). After careful examination using *Napue* and similar state supreme court decisions as its yardstick, the panel determined that Long had fairly presented the federal constitutional claim of due process to the State court and had not been procedurally defaulted. *Long*, 809 F. 3d at 309). The panel then found that: the testimony and credibility of the witness at issue "were vital to the State's case"; there was no doubt that key elements of her testimony were untrue; the State knew the testimony was false and neither

13

acknowledged nor confirmed its falsity; that had she told the truth, her testimony would have supported the testimony of two other witnesses that supported Long's innocence; that the State did not corroborate the testimony of its own investigator; that the failure to confirm enabled the jury to draw an unfounded conclusion; that the State's failure to correct was a clear due process violation; and this court's contrary decision was an unreasonable application of *Napue*, entitling Long to *habeas* relief. *Id.* at 308-12.

¶ 37      Regarding the ineffective assistance claim, the panel found that Long was also entitled to *habeas* relief because of the failure of appellate counsel to challenge the State's use of perjured testimony. *Id.* at 312-13. The panel unanimously reversed the district court's denial of the *habeas* writ and remanded with instructions for the court to order Long released "unless Illinois gives notice of its intent to retry Long within a reasonable time fixed by the district court." *Id.* at 317. It appeared that Long was going to finally get the new trial he had sought for so long.

¶ 38      However, this decision was followed by another hearing, this time before the Seventh Circuit sitting *en banc*. *Long v. Pfister*, 874 F. 3d 544 (7th Cir. 2017). The court reversed the decision of its panel on a five-to-three vote, finding, over a vigorous dissent, *not* that Long had a fair trial and was justly convicted, but that it was not established with certainty by *Napue* that the State has a duty to acknowledge the perjury of its own witness if the false testimony has been challenged, and allegedly impeached, by defense counsel. *Id.* at 549-50.

¶ 39      The dissenting opinion in *Long v. Pfister*, which I believe to be correct, generally speaks for itself. However, I offer the following quote to emphasize the unfairness of Long's proceedings:

> "We should not close our eyes to other instances of prosecutorial overreach, including two outrages from the rebuttal closing argument, when the defense could not respond.

First, the prosecution pulled a blatantly racist stunt, comparing those present when the police arrived to the slave characters in *Gone with the Wind*, quoting from the scene where Scarlett O'Hara tells the slave Prissy to help her deliver Melanie Wilkes's baby. Prissy famously tells 'Miss Scarlett' that she 'don't know nothin' 'bout birthin' babies,' and is promptly slapped. See Supp. App. 168; see also Supp. App. 70-71 (McDade, J., dissenting from affirmance on direct appeal) (prosecutor's use of *Gone with the Wind* passage was 'blatant appeal to racism' that worked). And a few moments later, the prosecutor went so far as to describe a letter Irby had written that was not even in evidence. The judge had to interrupt and told the jury to disregard that blatant attempt by the experienced lead prosecutor to put unadmitted hearsay in front of the jury, Supp. App. 171, but she got the jury's attention. During deliberations, the jury asked to see that letter.

In short, Long was not convicted in a fair trial. We should order that he receive a new trial." *Id.* at 556-57 (Hamilton, C.J., dissenting, joined by Rovner and Williams, C.JJ.).

¶ 40 *Long was not convicted in a fair trial*. Yet his conviction and sentence stand even though both resulted from a deeply flawed trial that violated his constitutional right to due process. Should the law ever deny a remedy to a defendant who has been deprived of a fair trial and convicted? In the context of fourth amendment violations, a protection is built into the law in which *any* evidence obtained through the violation of a defendant's fourth amendment rights is subject to being suppressed as "fruit of the poisonous tree." *People v. Henderson*, 2013 IL 114040, ¶ 33. A similar protection ought to be built into the law in situations such as Long's.

15

¶ 41    I recognize that the law favors the finality of judgments. See, *e.g.*, *People v. Clark*, 2023 IL 127273, ¶ 39 (quoting *Teague v. Lane*, 489 U.S. 288, 309 (1989) for the proposition that "[w]ithout finality, the criminal law is deprived of much of its deterrent effect"). But what are we sacrificing when we hold our noses and affirm a judgment resulting from a trial in which a defendant's constitutional rights were so clearly violated? In such situations, obviously the defendant—here, Long—has the most to lose, and that loss ought to be enough to justify additional legal protections. But I submit that we as a society all lose when we fail to correct something so fundamentally rotten.

¶ 42    When a criminal defendant challenges the sufficiency of the evidence to convict, a reviewing court is required to view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the charged crime proven beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). This standard does not exactly allow a reviewing court to critically analyze the defendant's claim. However, if a defendant attempts to challenge his conviction and sentence through a postconviction petition, we are called upon to heavily scrutinize the contents of the defendant's postconviction petition and the procedure associated with it because the policy favoring the finality of judgments warrants it. In the instant case, that means Long's successive postconviction petition is "highly disfavored" (*People v. Bailey*, 2017 IL 121450, ¶ 39) and can only be filed if "fundamental fairness" so requires (*People v. Wilson*, 2023 IL 127666, ¶ 23). Ironically, Long is only in this position today because he was denied fundamental fairness and denied a remedy. We ought to be able to do better.